# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **:** | |
| | **:** | |
| | **:** | |
| **v.** | **:** | **CRIMINAL ACTION** |
| | **:** | |
| **DEVOS LTD. d/b/a Guaranteed** | **:** | **NO. 14-574 (PBT)** |
| **Returns, et al.** | **:** | |
| | **:** | |

## DEFENDANTS' SUPPLEMENTAL OPPOSITION TO THE GOVERNMENT'S MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY

Defendants Devos Ltd. d/b/a Guaranteed Returns ("Guaranteed Returns" or "the company"), Dean Volkes, and Donna Fallon respectfully submit this supplemental memorandum of law in opposition to the government's motion *in limine* to exclude expert testimony. For no less than six reasons, the government's motion is meritless and should be rejected in its entirety.

*First*, as the Court ordered on February 1, 2017, the defendants have provided the government with detailed disclosures regarding the anticipated expert testimony of Mr. Brian Berntson, Professor Claire Finkelstein, Dr. Sophia Pasedis, Mr. Raymond Scheel, Mr. William Shea, Mr. Louis Cinquanto, and retired Brigadier General Edward M. Harrington. Those supplemental disclosures, as well as the *curriculum vitae* of the defense experts for whom such CVs are currently available, and the original disclosures provided to the government on January 16, 2017, are attached as Exhibits A – L.[1] The scope and breadth of these disclosures (of which the government only had two at the time it filed its premature and meritless motion to exclude) demonstrate how seriously the defendants have taken their expert disclosure obligations, and confirm that the defense has more than amply satisfied the expert disclosure requirements provided for in Federal Rule of Criminal Procedure 16. Indeed, in the government's supplemental motion to exclude filed on March 4, 2017, the government does not even dispute that the defendants have satisfied Rule 16's requirements.

*Second*, the government's arguments seeking to exclude the testimony of Mr. Brian Berntson, Professor Claire Finkelstein, Dr. Sophia Pasedis, Mr. Raymond Scheel, and Mr. William Shea pursuant to Federal Rules of Evidence 702 and 704 have already been addressed

---

[1] Although the defense provided the government with preliminary Rule 16 disclosures for Mr. Harris Devor, at present, the defense cannot provide further disclosures for Mr. Devor because, if called, his testimony would be in response to the testimony of Special Agent Woodring, which has not yet been concluded. Further, the defense has not supplemented the disclosure of Dr. Sophia Pasedis, on the grounds that Dr. Pasedis will not offer opinion testimony, and instead will offer factual testimony regarding relevant aspects of the evolution of the reverse distribution industry.

and refuted in the defendants' opposition filed on January 23, 2017. See Dkt. No. 187 (attached hereto as Exhibit M.) The defense incorporates by reference the arguments stated in its January 23, 2017 opposition, and reasserts them herein.

*Third*, the government's opposition to Professor Finkelstein's testimony on the subject of contract law is deeply ironic, and wholly unfounded, given the government's by-now familiar pattern of eliciting testimony (over defense objections) from numerous lay-person witnesses regarding their own views and interpretations as to Guaranteed Returns's contracts with its customers. Put simply, if the government can have pharmacists and salespeople offer their views regarding the obligations created by Guaranteed Returns's contracts, then certainly an esteemed law professor from the University of Pennsylvania Law School, who actually has expertise on the meaning of contracts, should be allowed to do the same.

*Fourth*, the government is simply wrong that *United States v. Cavin*, 39 F.3d 1299 (5th Cir. 1994), which held that excluding expert testimony on the non-governing law can be reversible error, applies only to lawyer-defendants. The reasoning in *Cavin* does not rely upon the defendant's status as a lawyer, *see id.* at 1309, and in fact, *Cavin* has been followed in this very district in a case concerning a non-lawyer defendant in charge of marketing activities. *United States v. Jasin*, 215 F.Supp.2d 552, 570 (E.D. Pa. 2002) ("[A]n expert's testimony concerning the state of the law . . . is admissible as it relates to the defendants' 'understanding and resulting state of mind.'") (quoting *Cavin*).[2] Here, the evidence has shown that Dean Volkes believed that he was permitted under the applicable law and contracts, including the Returns Authorization Form, to age customer indates and return them for Guaranteed Returns's own

---

[2] *See United States v. Jasin*, No. 91-00602-08, 1993 WL 259436 at *2 (E.D. Pa. July 7, 1993) (describing Jasin's role as a marketer).

behalf. Thus, just as the defendant in *Cavin* was entitled to introduce expert legal testimony to support his interpretation of certain stock rental transactions and therefore prove that he acted without fraudulent intent, *Cavin*, 39 F.3d at 1309, the defendants here are entitled to introduce Professor Finkelstein's testimony to support the reasonableness of Mr. Volkes's interpretation of the applicable contracts and the Return Authorization form.

*Fifth*, regarding the two defense experts who were not discussed in the defendants' earlier briefing, Mr. Louis Cinquanto and retired Brigadier General Edward M. Harrington, the defendants' supplement their prior briefing as follows:

- <u>Mr. Louis Cinquanto</u>: The government objects to the expert testimony of Louis Cinquanto on the grounds that it lacks foundation in the facts of this case. This is frivolous. As explained in Mr. Cinquanto's supplemental Rule 16 disclosure, Mr. Cinquanto has reviewed a forensic image of the QPH5 server and will offer his opinion regarding the activities that occurred on that server, including but not limited to testimony as to which users installed and ran BCWipe and other software, and what the BC Wipe activity shows about critical aspects of this case. *See* Ex. D at 2 – 4. Mr. Cinquanto's testimony is therefore founded in relevant evidence, and the government's objection is baseless. Moreover, since Mr. Cinquanto's testimony will explain technical concepts related to data storage, deletion, and wiping, and will identify which users accessed the QPH5 server to run or install BCWipe and other software programs around the time at which the alleged obstruction took place, the testimony will be helpful to the jury and is entirely admissible pursuant to Federal Rule of Evidence 702.

- <u>Mr. Edward M. Harrington</u>: As stated in defendants' disclosure, retired Brigadier General Harrington will testify "as to the standards and practices of government contracting, including the process undertaken by the Department of Defense when a contract need is identified, when a contract is entered, and when a contract is modified. He will explain whether or how services extrinsic to the formal Statement of Work on a government contract may be incorporated into that contract. He will opine that the processes followed with respect to the 2001 DoD contract, as reflected by the DoD contract file, were insufficient to modify the contract or the Statement of Work so as to impose a duty to manage indated pharmaceuticals." Ex. E at 2. Of course, whether the 2001 DoD contract did or did not provide for indate aging is an essential aspect of this case, and the defendants should therefore be permitted to call upon Mr. Harrington's expertise in this regard. Further, the defendants' January 23, 2017 memorandum in opposition to the governments' original motion set forth authorities confirming that expert testimony, including testimony about legal issues bearing on but not

directly determining the jury's conclusions, is proper.  The Third Circuit has repeatedly affirmed that such testimony regarding industry custom and practice is permissible.  *See, e.g., Berckeley Inv. Grp., Ltd. v. Colkitt,* 455 F.3d 195, 217–19 (3d Cir. 2006) (permitting defendants to offer "evidence of industry custom and practice to demonstrate that they had not acted with the requisite scienter"); *United States v. Leo*, 941 F.2d 181, 197 (3d Cir. 1991) (approving expert testimony "about customs and practices in the defense industry"); *see also United States v. Fumo*, 655 F.3d 288, 303 (3d Cir. 2011), as amended (Sept. 15, 2011) ("expert testimony may also concern . . . laws related to public officials and government contractors").

*Sixth* and last, courts recognize that expert testimony can be an essential component of a defense case, and have thus vacated convictions where such expert testimony was improperly excluded by the district court, including in cases where the excluded expert testimony related to legal matters.  *See United States v. Litvak*, 808 F.3d 160, 165 – 166 (2d Cir. 2015) ("[T]he District Court exceeded its allowable discretion in excluding certain portions of [defendant's] experts' proffered testimony, and . . . the exclusion of at least one portion was not harmless. Accordingly, we vacate the District Court's judgment of conviction . . . and remand for a new trial."); *Cavin*, 39 F.3d at 1308 (vacating conviction and remanding for a new trial due to improper exclusion of expert legal testimony, and noting that "[b]y disallowing that testimony the district court deprived Daigle of an opportunity to present critical evidence that he lacked fraudulent intent").  Here, depriving the defendants of their right to call the expert witnesses described above would unjustly and unfairly hamstring the defense, would deprive the jury of information that will be highly valuable to its proper function, and will undermine the legitimacy of any outcome in this matter.

## CONCLUSION

For the forgoing reasons, the defendants respectfully request that the Court deny the

government's motion *in limine* seeking exclusion of the defendants' experts.


Dated: Philadelphia, Pennsylvania
       March 7, 2017

Respectfully Submitted,

**SCHLAM STONE & DOLAN LLP**

**By:**  /s/ Douglas E. Grover
      Douglas E. Grover
      Thomas A. Kissane

      26 Broadway
      New York, New York 10004
      Tel. 212.344.5400
      Fax 212.344.7677
      dgrover@schlamstone.com
      tkissane@schlamstone.com

**LAW OFFICES OF ANN C. FLANNERY, LLC**

**By:**  /s/ Ann C. Flannery
      Ann C. Flannery

      1835 Market Street, Suite 2700
      Philadelphia, Pennsylvania 19103
      Tel. 215.636.9002
      Fax 215.636.9899
      acf@annflannerylaw.com

      *Attorneys for Defendant Devos Ltd. d/b/a Guaranteed Returns*

**MORVILLO ABRAMOWITZ
GRAND IASON & ANELLO P.C.**

By: /s/ Elkan Abramowitz
Elkan Abramowitz
Robert M. Radick
Miriam L. Glaser
Ashley C. Burns
Christopher D. Brumwell

565 Fifth Avenue
New York, New York 10017
Tel. 212.856.9600
Fax. 212.856.9494
eabramowitz@maglaw.com
rradick@maglaw.com
mglaser@maglaw.com
aburns@maglaw.com
cbrumwell@maglaw.com

*Attorneys for Defendant Dean Volkes*


**PROSKAUER ROSE LLP**

By: /s/ Robert J. Cleary
Robert J. Cleary
William C. Komaroff

11 Times Square
New York, New York 10036
Tel. 212.969.3000
Fax 212.969.2900
rjcleary@proskauer.com
wkomaroff@proskauer.com


*Attorneys for Defendant Donna Fallon*

# Exhibit A

# MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

ELKAN ABRAMOWITZ
RICHARD F. ALBERT
ROBERT J. ANELLO*
LAWRENCE S. BADER
BENJAMIN S. FISCHER
CATHERINE M. FOTI
PAUL R. GRAND
LAWRENCE IASON
BRIAN A. JACOBS
JUDITH L. MOGUL
JODI MISHER PEIKIN
ROBERT M. RADICK*
JONATHAN S. SACK**
EDWARD M. SPIRO
JEREMY H. TEMKIN
RICHARD D. WEINBERG

565 FIFTH AVENUE
NEW YORK, NEW YORK 10017
(212) 856-9600
FAX: (212) 856-9494

www.maglaw.com

WRITER'S CONTACT INFORMATION

(212) 880 - 9558
rradick@maglaw.com

COUNSEL
JASMINE JUTEAU
CURTIS B. LEITNER
JACOB W. MERMELSTEIN
DANIEL F. WACHTELL

ROBERT G. MORVILLO
1938-2011
MICHAEL C. SILBERBERG
1940-2002
JOHN J. TIGUE, JR.
1939-2009

*ALSO ADMITTED IN WASHINGTON, D.C.
**ALSO ADMITTED IN CONNECTICUT

March 5, 2017

## By Email

Nancy Rue, Esq.
Patrick Murray, Esq.
Assistant U.S. Attorneys
United States Attorney's Office for the Eastern
  District Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

> Re: *United States v. Devos Ltd., d/b/a Guaranteed Returns, Dean Volkes, Donna Fallon, and Ronald Carlino*, Crim. No. 14-574

Dear Ms. Rue and Mr. Murray:

On behalf of Devos Ltd. d/b/a Guaranteed Returns, Dean Volkes, and Donna Fallon (collectively, the "defendants"), pursuant to Federal Rule of Criminal Procedure 16(b)(1)(C) and the Court's order dated February 1, 2017 (Dkt. #213), we write to provide the government with a supplemental summary of the opinions and anticipated expert testimony of Professor Claire Finkelstein.[1]

Professor Finkelstein will be offered as an expert regarding the terms of the contracts that Guaranteed Returns entered into with its civilian (i.e., non-military) customers. Professor Finkelstein is not being offered as an expert on the military contracting process, nor on the terms of the contracts between Department of Defense entities and Guaranteed Returns. To the extent

---

[1] The defendants reserve the right to supplement, amend, or expand upon this disclosure as circumstances warrant. Additionally, the defendants are preparing supplemental notices regarding further anticipated expert witnesses, and will provide those notices to you as they are available.

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.
Nancy Rue, Esq.
Patrick Murray, Esq.
Assistant U.S. Attorneys
March 5, 2017
Page 2

the defendants offer expert testimony regarding the Department of Defense contracts at issue in this case, such evidence will be elicited through Brigadier General Edward M. Harrington

Based on her education and extensive experience teaching and writing about the law of contracts,[2] Professor Finkelstein will describe general principles of contract law for the jury. Professor Finkelstein will explain that there are general principles that are common to the law of contracts across all jurisdictions, and while contract law varies somewhat from jurisdiction to jurisdiction, there is a high degree of consistency in the law across jurisdictions. Professor Finkelstein will inform the jury that, unlike ordinary promises between individuals, a contract is an exchange of promises in which at least one party agrees to do something in the future, and as to which both parties intend to be legally bound. Professor Finkelstein will testify that parties generally enter into legally binding contracts because they believe they will be better off as a result of the agreement embodied in the contract, and because they expect that they will receive something under the contract that they want or need. Parties to a contract seek to ensure that the contract is legally binding because, in the event that disputes arise or circumstances change, the parties to a binding contract will have assurances that the contract will be performed pursuant to the terms embodied therein. Further, in order to ensure that their intent to be bound is conveyed, and that the parties (and, if necessary, a court) will understand the contract should a dispute arise, the parties to a contract frequently reduce the terms of the contract to writing. Professor Finkelstein will testify that a written contract reflects the deal that the parties to that contract have negotiated and agreed upon; that a contract is reduced to writing in part so as to ensure that no one is confused into believing that prior discussion or negotiations are part of the contract's terms; and so that the parties' obligations are governed by the contract itself, rather than by their unexpressed private thoughts.

Regarding the principles of contract formation and acceptance, Professor Finkelstein will explain that a party to a written contract is bound by the terms and conditions of the writing, even if the party elects not to read the contract, does not investigate the meaning of the contract, and/or does not understand the terms of the contract. In this regard, Professor Finkelstein will testify that there are many contracts that individuals accept and are bound by, even if they decline to review or analyze the contract's terms. By way of illustrative examples, Professor Finkelstein may explain that individuals or companies who ship goods using an overnight courier's air bill are bound by the terms contained thereon; that individuals who park their cars in private parking lots agree to be bound by posted terms and conditions; and that individuals who bring their clothes to a drycleaner agree to be bound by the policies and conditions set forth on the back of their claim ticket. Professor Finkelstein will further testify that in each of the examples described above, and in the contracting process generally, whether or not a party to a commercial transaction has chosen to avail himself of the opportunity to read the terms or

---

[2] This experience and education is summarized in Professor Finkelstein's curriculum vitae, which the defendants have already provided to you.

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.
Nancy Rue, Esq.
Patrick Murray, Esq.
Assistant U.S. Attorneys
March 5, 2017
Page 3

conditions at issue, and whether the party has signed a contractual agreement, does not have bearing on whether that party has agreed to be bound. Instead, the mere utilization of the services offered to the customer, after the customer has had the opportunity to review the service terms, will conclusively establish the party's willingness to be bound by those terms.

Professor Finkelstein is also expected to testify generally regarding the different standards that exist for consumer contracts on the one hand, and commercial contracts on the other. In particular, Professor Finkelstein will explain to the jury that, as a general matter, contracts are invalidated based on procedural irregularities only when the counterparty to the contract is an unsophisticated consumer who lacks access to legal advice; when there is a major power imbalance between the consumer on the one side and a company on the other; and where the consumer was subjected to pressured sales tactics to enter into the contract. Moreover, Professor Finkelstein will testify that even in the case of consumer contracts in which the above-described elements are present, numerous factors can defeat the argument that a contract should be invalidated based on procedural irregularities. For example, if a consumer who is the potential counterparty to a contract is allowed a meaningful opportunity to review the agreement (even for a relatively modest period of time), or is given the opportunity to seek to negotiate or amend the terms of the contract, it is highly unlikely that the contract will have been found to be unenforceable. Further, Professor Finkelstein will testify that these concerns about procedural irregularity in contract formation do not apply to contracts that have been entered into between "sophisticated" commercial actors, with sophistication having consistently been found to exist in actors who have access to legal advice, regardless of whether such actors actually obtain legal advice, and regardless of their skill or expertise in the industry in question.

In addition to the foregoing, Professor Finkelstein will discuss whether a party to a contract is under a duty to disclose to a counterparty certain factual or legal issues. In this regard, Professor Finkelstein will testify that, in contracts between commercial actors, there is no duty to point out to the counterparty any contractual provisions that the counterparty or its lawyers may not have observed when reviewing the written contract. Professor Finkelstein will testify that the parties to a commercial contract are generally not under a duty to disclose because, under contract law, the parties are considered to be equally sophisticated, and each is able to obtain legal advice regarding the contract's provisions. Professor Finkelstein will also testify that there is no duty under contract law to notify a counterparty regarding the existence or non-existence of a contract term that was referenced in promotional discussions and solicitations. In this regard, Professor Finkelstein will testify that, under contract law, statements made during promotional efforts, including statements made in marketing materials, are not offers, but instead are merely requests for offers or invitations to negotiate.

With respect to the standard template contract that Guaranteed Returns adopted for use with its customers, Professor Finkelstein will testify that the standard contract is a fully-integrated contract that incorporates by reference the terms of the Return Authorization form (the

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.
Nancy Rue, Esq.
Patrick Murray, Esq.
Assistant U.S. Attorneys
March 5, 2017
Page 4

"RA Form"), as well as the standard terms and conditions provided for on Guaranteed Returns's website under the tab labeled as "policies." More specifically, Professor Finkelstein will explain that the second paragraph appearing under Section IV ("Miscellaneous Terms"), is an integration clause that makes the agreement a fully integrated contract. Professor Finkelstein will explain that an integration clause indicates that the written contract represents the entire agreement between the parties as to the subject matter of the contract. Professor Finkelstein will explain that integration clauses are routinely used in commercial contracts, and that parties use integration clauses in order to ensure predictability and to avoid misunderstandings by making sure that the writing constitutes the entire scope of the agreement between the parties on the subject matter covered therein. Professor Finkelstein will testify that, when interpreting a fully integrated contract, evidence appearing outside of the written agreement cannot be used to supplement the terms of the contract. Professor Finkelstein will also explain that while extrinsic evidence can be used to interpret the meaning of the terms of a fully integrated contract, such evidence can be used only as long as it does not contradict the existing terms of the agreement.

As applied to the template contract, Professor Finkelstein will testify that the foregoing principles mean that the template contract did not provide for indate aging, and that any subjective views on the part of a customer regarding indate aging, as well as any statements made outside of the scope of the contract (including by sales representatives of Guaranteed Returns), cannot be used to support the claim that the contract obligates Guaranteed Returns to age indates for its customers. In this regard, Professor Finkelstein will testify that, because the RA Form and the website's standards terms and conditions are incorporated into the template contract, and because those writings indicate that the services promised for do not include a right to remuneration for any drug that is not "immediately creditable", indate aging services are excluded by the agreement. Professor Finkelstein will further testify that, for those customers who were covered by the standard agreement or variations thereof that did not alter the foregoing aspects of the agreement, the fact that the RA Form and the terms and conditions from the company's website were incorporated into the agreement gave Guaranteed Returns the contractual right to keep the indates that its customers sent in, age those indates, and return the indates for the benefit of Guaranteed Returns. Professor Finkelstein will also testify that any verbal statements by sales representatives indicating that Guaranteed Returns would age indates for its customers, and any equivalent statements in marketing materials, do not alter the fact that indate aging is not an agreed-upon service under the contract. Professor Finkelstein will also testify that, even if certain types of drugs described in the contract (such as damaged, recalled, or overstocked drugs) may include drugs that are indated, that too does not create an obligation on the part of Guaranteed Returns to age indates on behalf of its customers. In this regard, Professor Finkelstein is expected to testify that the more specific reference in the RA Form and the company's website to drugs that are not "immediately creditable" governs the contractual obligations regarding indated drugs, and that statements regarding more general categories of drugs such as damaged, recalled, or overstocked do not vitiate or alter the provisions in the RA form and the website which govern the parties' rights with respect to indates.

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.
Nancy Rue, Esq.
Patrick Murray, Esq.
Assistant U.S. Attorneys
March 5, 2017
Page 5

Similarly, Professor Finkelstein is expected to testify that while evidence that is extrinsic to a fully integrated contract can be used to interpret the meaning of terms in the contract, evidence of a customer's subjective understanding regarding its expected treatment of indates, and evidence regarding statements made in marketing materials or during the course of commercial solicitation or negotiation, are not relevant to the meaning of the provisions relating to indated drugs if they would contradict the terms of the agreement itself. As such, under the template contract, indate aging is not a service that Guaranteed Returns promised to provide, and to the contrary, Guaranteed Returns was legally authorized under the contract to keep indates, age them for its own benefit, and keep the money that manufacturers transmitted to Guaranteed Returns for those indates. Further, Professor Finkelstein will address the significance, if any, of the following arguments: that the policies relating to drugs that were not immediately creditable were on the back of the RA form; that customers of Guaranteed Returns may not have signed the RA form; that customers of Guaranteed Returns may not have reviewed the RA form or the company's policies as set forth on its website; that customers may not have understood the meaning of the language of the RA form or the language set forth on the company's website; and that, in some instances, customers may not themselves have placed the RA form into the box by which drugs were being shipped to Guaranteed Returns. With respect to each of these arguments, Professor Finkelstein will explain that, based on the general contract principles set forth above, none of those factors undermine or alter the conclusion that the RA form and the website's terms and conditions were incorporated into the contract between the parties, thereby giving Guaranteed Returns the legal right to age and return indated drugs on its own behalf.

In addition to addressing the template contract, Professor Finkelstein will address the non-military/non-DOD contracts that were entered into evidence during the course of this trial. Professor Finkelstein will testify that, based upon her review of those contracts, as well as the general principles of contract law, none of those contracts (with the exception of the September 10, 2007 contract between Guaranteed Returns and the University of Michigan Health Services, and the August 2002 contract between Guaranteed Returns and Minnesota Multistate Contracting Alliance for Pharmacy) required Guaranteed Returns to age indates on behalf of its customers, and none prohibited Guaranteed Returns from aging indates and returning them on its own behalf.

Very Truly Yours,

Robert M. Radick

cc:    Counsel of Record (by email)

# Exhibit B

# MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

ELKAN ABRAMOWITZ
RICHARD F. ALBERT
ROBERT J. ANELLO*
LAWRENCE S. BADER
BENJAMIN S. FISCHER
CATHERINE M. FOTI
PAUL R. GRAND
LAWRENCE IASON
BRIAN A. JACOBS
JUDITH L. MOGUL
JODI MISHER PEIKIN
ROBERT M. RADICK*
JONATHAN S. SACK**
EDWARD M. SPIRO
JEREMY H. TEMKIN
RICHARD D. WEINBERG

565 FIFTH AVENUE
NEW YORK, NEW YORK 10017
(212) 856-9600
FAX: (212) 856-9494

www.maglaw.com

WRITER'S CONTACT INFORMATION

(212) 880 - 9558
rradick@maglaw.com

COUNSEL
JASMINE JUTEAU
CURTIS B. LEITNER
JACOB W. MERMELSTEIN
DANIEL F. WACHTELL

ROBERT G. MORVILLO
1938-2011
MICHAEL C. SILBERBERG
1940-2002
JOHN J. TIGUE, JR.
1939-2009

*ALSO ADMITTED IN WASHINGTON, D.C.
**ALSO ADMITTED IN CONNECTICUT

March 5, 2017

## By Email

Nancy Rue, Esq.
Patrick Murray, Esq.
Assistant U.S. Attorneys
United States Attorney's Office for the Eastern
  District of Pennsylvania
615 Chestnut Street, Suit 1250
Philadelphia, PA 19106

> Re:   *United States v. Devos Ltd., d/b/a Guaranteed Returns et al.*,
>       Crim. No. 14-574 (PBT)

Dear Ms. Rue and Mr. Murray:

On behalf of Devos Ltd. d/b/a Guaranteed Returns ("GRx" or the "Company"), Dean Volkes, and Donna Fallon (collectively, the "defendants"), pursuant to Federal Rule of Criminal Procedure 16(b)(1)(C) and the Court's order dated February 1, 2017 (Dkt. #213), we write to provide the government with a supplemental summary of the anticipated opinions and testimony of William Shea.[1]

---

[1] By this disclosure, the defendants do not concede that Mr. Shea's anticipated testimony constitutes the type of expert opinion testimony that falls within the scope of Rule 702 of the Federal Rules of Evidence. Instead, while Mr. Shea has considerable experience in the specialized field of accounting (as reflected in the curriculum vitae that we previously provided), Mr. Shea's testimony is expected to be more akin to that of an individual who, like a case agent, is able to review, analyze, and summarize voluminous data sets. Nonetheless, in an abundance of caution, and in order to remove any question of the defendants' compliance with the Court's Order dated February 1, 2017, we provide this disclosure of Mr. Shea's anticipated testimony.

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.
Nancy Rue, Esq.
Patrick Murray, Esq.
Assistant U.S. Attorneys
March 5, 2017
Page 2

Mr. Shea is expected to testify regarding his analysis of certain records relating to GRx and its customers. Specifically, Mr. Shea is expected to testify that, for the period between the October 1, 2007 effective date of Defense Supply Center Philadelphia ("DSCP") Contract Number SPM200-07-D-5201 (the "5201 Contract") and the expiration of the 5201 Contract's bridge period (February 28, 2013 for customers serviced by the DVA Pharmaceutical Prime Vendor Program and September 30, 2013 for customers serviced by the DOD Pharmaceutical Prime Vendor Program (*see* D0000001)) (the "Analysis Period"), Mr. Shea analyzed the Company's treatment of indates that were sent to Guaranteed Returns by specific government customers, and in particular, the treatment of the indates of government customers who elected to switch from Guaranteed Returns to another reverse distributor under the terms of the 5201 Contract.

Mr. Shea's analysis involved the comparison of two sets of data. The first data set was comprised of all GR_INDPR records generated from the server seized from GRx in 2014.[2] The second data set was comprised of correspondence between GRx and the DSCP, as well as records maintained by the DSCP,[3] that identify those government customers who are within the scope of the 5201 Contract: that is, customers affiliated with the Department of Defense, the Department of Veterans Affairs, the Bureau of Prisons, the Indian Health Service, the District of Columbia Department of Health, and other pertinent government agencies. From within this second data set, Mr. Shea also reviewed documents that identified those government agencies

---

The defendants reserve the right to supplement, amend, or expand upon this disclosure as circumstances warrant.

[2] This data set was provided to Mr. Shea in five parts due to its size. Four of the five parts have been available to the government for inspection and copying since January 16, 2017, the date of the defendants' first disclosure of potential defense exhibits. Those documents were identified in that production by Bates numbers D0000027-D0000030. The fifth part will be provided with this letter and is identified by Bates number D0000417. Although we do not intend to seek the admission of these records, they are admissible as business records of the Company.

[3] Certain of the documents that comprise this second data set have been available to the government for inspection and copying since either January 16, 2017 (the date of the defendants' first disclosure of potential defense exhibits), and others have been available since January 22, 2017 (the date of the defendants' second such disclosure). The documents that comprise this data set were identified in those productions by Bates numbers D000001-25, D0000069-88, D0000128-132, and DLATS-000001-163. One additional document included in this data set will be provided with this letter and is identified by Bates number D0000418. Some of these documents have been admitted into evidence during the course of this trial, and all are admissible as business records of the Company or the DSCP.

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.
Nancy Rue, Esq.
Patrick Murray, Esq.
Assistant U.S. Attorneys
March 5, 2017
Page 3

that were within the scope of the 5201 Contract and, during the Analysis Period, executed task orders by which they either chose GRx as their reverse distributor, or chose to terminate the services provided by GRx.[4]

Using correspondence between the DSCP and GRx, as well as other records, Mr. Shea identified those customers who, under the terms of the 5201 Contract, chose GRx as their reverse distributor during the period of the 5201 Contract – that is, entities that were active customers of the Company ("Active Customers"). Using the same records, Mr. Shea also identified those customers who chose a reverse distributor other than GRx during the period of the 5201 Contract – that is, entities that, at some point during the lifespan of the 5201 Contract, ceased to be active customers of the Company ("Former Customers").

Having identified the Active Customers and Former Customers under the 5201 Contract, Mr. Shea next analyzed whether indated pharmaceuticals sent to the Company by an Active Customer under the 5201 Contract were reprocessed to a customer store number, or to a GRX store number.[5] Similarly, Mr. Shea analyzed whether, subsequent to the date upon which the DSCP notified the Company that a customer had switched to a different reverse distributor, the indated pharmaceuticals of such customers were reprocessed to a customer store number, or to a GRX store number.

---

[4] In identifying and analyzing records relating to customers who are within the scope of the 5201 Contract, Mr. Shea determined that there are complexities in matching the names of entities reflected in government records and correspondence, with the names assigned to those entities in the GRx computer system. From within the GR_INDPR data set, Mr. Shea identified 1,583 unique Guaranteed Returns "customer/store" combinations associated with the 5201 Contract during the Analysis Period, while from within the data set of government records and correspondence, Mr. Shea identified 402 unique DSCP customer names under the 5201 Contract. This is because, in many cases, there is more than one Guaranteed Returns "store" name for a given customer, and customer names within the DSCP records often encompass more than one facility (for example, each Veterans Integrated Service Network (VISN) encompasses numerous facilities). Based on his analysis, Mr. Shea was able to match 338 of the 402 customer names reflected in government records with the names of customer "stores" found in the Guaranteed Returns computer system during the Analysis Period, and was able to match 1,248 of the 1,583 customer "stores" found in the GRx computer system during the Analysis Period with a customer name reflected in government records.

[5] The GRX store numbers that were used for this analysis are identical to those listed in Special Agent Joann Woodring's October 24, 2014 Affidavit in Support of Applications for Seizure Warrants (¶ 26) – namely, store numbers 44158-242, 22367-15426, 22431-753, 21322-23410, 43703-120, 44130-304, and 45778-530.

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.
Nancy Rue, Esq.
Patrick Murray, Esq.
Assistant U.S. Attorneys
March 5, 2017
Page 4

The results of Mr. Shea's analysis are as follows:

1. During the Analysis Period, the total value of reprocessed indated pharmaceuticals associated with customers covered by the 5201 Contract was approximately $73,367,131 (435,412 transactions).[6]

2. Of the foregoing total of $73,367,131 in reprocessed indated pharmaceuticals associated with customers covered by the 5201 Contract:

   a. A total of approximately $49,499,929 in indated pharmaceuticals received from a customer under the 5201 Contract (293,960 transactions) was reprocessed to a customer store number at times when that customer was active.

   b. A total of approximately $10,287,302 in indated pharmaceuticals received from a customer under the 5201 Contract (47,863 transactions) was reprocessed to a "GRX store" at times after such customers had left the contractual relationship with GRX.

   c. A total of approximately $7,071,743 in indated pharmaceuticals received from a customer under the 5201 Contract (56,038 transactions) was reprocessed to a customer store number even after such time as the customer had left the contractual relationship with GRX.

   d. A total of approximately $2,476,465 in indated pharmaceuticals received from a customer under the 5201 Contract (10,312 transactions) was reprocessed to a GRX store at times when that customer was active.

3. Of the total amount of $73,367,131, an amount of approximately $2,947,869 (17,729 transactions) was associated with Guaranteed Returns "customer/store" combinations that could not be matched with a DSCP customer name. Of this sum:

   a. Approximately $1,018,217 in indated pharmaceuticals (4,450 transactions) that could not be matched to a specific DSCP customer name was reprocessed to GRX stores.

---

[6] The value referred to herein is equivalent to and based upon the "price" field in the GR_INDPR records.

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.
Nancy Rue, Esq.
Patrick Murray, Esq.
Assistant U.S. Attorneys
March 5, 2017
Page 5

b. Approximately $1,929,652 in indated pharmaceuticals (13,279 transactions) that could not be matched to a specific DSCP customer name was reprocessed to customer stores.

4. Of the total amount of $73,367,131, an amount of approximately $1,083,824 (9,510 transactions) was associated with Guaranteed Returns "customer/store" combinations that were matched to a specific DSCP customer name but had reprocessed indate activity occurring prior to any documentation indicating an active or inactive contract status, which made it impossible to conclusively determine whether the customer was active or inactive during the period in question. Of this sum:

a. Approximately $48,150 in indated pharmaceuticals received from a customer under the 5201 Contract (301 transactions) for which a contract status could not be confirmed was reprocessed to GRX stores.

b. Approximately $1,035,675 in indated pharmaceuticals received from a customer under the 5201 Contract (9,209 transactions) for which a contract status could not be confirmed was reprocessed to customer stores.

Mr. Shea is also expected to testify regarding his analysis of the response rate and categories of responses to the government's on-line posting and direct mailings that advised customers that they had been identified as a victim of a fraud. Specifically, based upon information and surveys that the government has turned over in discovery, Mr. Shea is expected to testify that his review of the list of customers solicited shows that approximately 7,899 customers[7] were contacted as described above. Of these, 634 customers responded to the solicitation,[8] 616 completed the survey sent by the government,[9] and 7,265 did not respond to the

---

[7] Based on information provided by the government, the government attempted to contact 8,599 customers, but approximately 700 pieces of mail were undeliverable, and we therefore consider the number of customers contacted to be 7,899.

[8] The survey data that follows is as of March 4, 2017. The government informed defense counsel on the morning of March 5, 2017 that it had received additional surveys. Once reviewed, these additional surveys will be incorporated into Mr. Shea's analysis.

[9] Eighteen customers responded to the government's solicitation but did not complete the survey.

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.
Nancy Rue, Esq.
Patrick Murray, Esq.
Assistant U.S. Attorneys
March 5, 2017
Page 6

solicitation or survey at all. Further, with respect to the 616 customers who completed the survey:

1. 324 of the 616 answered "yes" to question 6, indicating that they had returned indated product to GRx, and of those 324 customers:

   a. 233 answered "yes" to question 9b, indicating that they had been told they would get credit for indated product;

   b. 91 did not answer "yes" to question 9b, giving no indication that they had been told they would get credit for indated product;

2. 292 of the 616 customers, in response to question 6, answered "no," "n/a," or did not respond to the question, thereby giving no indication that they had returned indated product to GRx;

3. 341 of the 616 customers, in response to question 9b, answered "no," n/a," or did not respond, thereby indicating that they had not been told they would get credit for indated product.

Very Truly Yours,

Robert M. Radick

cc: Counsel of Record (by email)

# Exhibit C

# MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

ELKAN ABRAMOWITZ
RICHARD F. ALBERT
ROBERT J. ANELLO*
LAWRENCE S. BADER
BENJAMIN S. FISCHER
CATHERINE M. FOTI
PAUL R. GRAND
LAWRENCE IASON
BRIAN A. JACOBS
JUDITH L. MOGUL
JODI MISHER PEIKIN
ROBERT M. RADICK*
JONATHAN S. SACK**
EDWARD M. SPIRO
JEREMY H. TEMKIN
RICHARD D. WEINBERG

565 FIFTH AVENUE
NEW YORK, NEW YORK 10017
(212) 856-9600
FAX: (212) 856-9494

www.maglaw.com

WRITER'S CONTACT INFORMATION

(212) 880 - 9558
rradick@maglaw.com

February 28, 2017

COUNSEL
JASMINE JUTEAU
CURTIS B. LEITNER
JACOB W. MERMELSTEIN
DANIEL F. WACHTELL

ROBERT G. MORVILLO
1938-2011
MICHAEL C. SILBERBERG
1940-2002
JOHN J. TIGUE, JR.
1939-2009

*ALSO ADMITTED IN WASHINGTON, D.C.
**ALSO ADMITTED IN CONNECTICUT

## By Email

Nancy Rue, Esq.
Patrick Murray, Esq.
Assistant U.S. Attorneys
United States Attorney's Office for the Eastern
  District Pennsylvania
615 Chestnut Street, Suit 1250
Philadelphia, PA 19106

> Re: *United States v. Devos Ltd., d/b/a Guaranteed Returns et al.,*
> Crim. No. 14-574 (PBT)

Dear Ms. Rue and Mr. Murray:

On behalf of Devos Ltd. d/b/a Guaranteed Returns, Dean Volkes, and Donna Fallon (collectively, the "defendants"), pursuant to Federal Rule of Criminal Procedure 16(b)(1)(C) and the Court's order dated February 1, 2017 (Dkt. #213), we write to provide the government with a supplemental summary of the anticipated opinions and expert testimony of defense experts Brian Berntson and Ray Scheel.[1]

### Brian Berntson

The defendants intend to call Mr. Brian Berntson as an expert in money laundering. Based on his extensive training and experience as a Criminal Investigation agent with the

---

[1] The defendants reserve the right to supplement, amend, or expand upon this disclosure as circumstances warrant. Additionally, the defendants are preparing supplemental notices regarding further anticipated expert witnesses, and will provide those notices to you as they are available.

**MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.**
Nancy Rue, Esq.
Patrick Murray, Esq.
Assistant U.S. Attorneys
February 28, 2017
Page 2

Internal Revenue Service,[2] as well as his experience in training other agents and testifying on behalf of the government as a money laundering expert in prior federal cases, Mr. Berntson will explain basic principles of money laundering, and will discuss the ways in which individuals and entities typically launder money.

As part of his testimony, Mr. Berntson will explain to the jury the three steps that are inherent parts of a money laundering offense: placement, layering, and integration. With respect to placement, Mr. Berntson will testify that placement is the step at which the proceeds of a specified unlawful activity enter the financial system. Mr. Berntson will explain that placement can occur through various means, including a wire transfer or the purchase of a money order, cashier's check, or other monetary instrument. Mr. Berntson will further explain that placement can occur only after the completion of the specified unlawful activity that gave rise to illegally obtained funds, because money laundering concerns transactions in illegal proceeds, and if the underlying specified unlawful activity is not yet complete, the funds that are the subject of a financial transaction are not the proceeds of that offense.

With respect to layering, Mr. Berntson will explain that this is the step in which a series of transactions move money through the financial system in an effort to conceal the true source, nature, location, control, or ownership of that money. Mr. Berntson will explain that layering can take place through a variety of means, such as by transferring the funds to a nominee (an individual with no ownership interest in the money being moved through the financial system) and then directing the nominee to engage in additional transactions with those funds. Mr. Berntson will further explain that layering can take place by forming a bank account with a shell corporation, transferring proceeds into the account, and using the shell corporation to engage in further transactions with the laundered funds. By way of further example, Mr. Berntson will explain that layering can also occur through, among other means, the mischaracterization of transactions involving illegal proceeds.

Regarding integration, Mr. Berntson will explain that integration is the step by which laundered funds are removed from the financial system in a way that allows a money launderer to take control of the laundered funds. Mr. Berntson will explain that integration allows an individual to move laundered funds out of the financial system in a way that impedes law enforcement from discovering the criminal source of those proceeds.

We note that Mr. Berntson's testimony – which has been allowed in various federal cases, including cases in which he was called by the government as a money laundering expert – will not include an assessment of whether the financial transactions in this case do or do not reflect the attributes of money laundering. Instead, Mr. Berntson's testimony will be limited to explaining the above-mentioned features of a money laundering offense, and the ways in which

---

[2] This experience and training is summarized in Mr. Berntson's curriculum vitae, which the defendants have already provided to you.

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.
Nancy Rue, Esq.
Patrick Murray, Esq.
Assistant U.S. Attorneys
February 28, 2017
Page 3

defendants who have received the proceeds of a specified unlawful activity effectuate the laundering of those proceeds.

## Ray Scheel

Based on his technical expertise in data handling, database programming and development, and filePro,[3] Ray Scheel will offer basic information about filePro. He will explain, among other things, that it is a database programming language. He will also present to the jury background information about the types of data stored in filePro and how that data is accessed and modified.

In his further testimony, Mr. Scheel will define the concept of a free chain. He will explain that free chains are structures that filePro uses to track where there exists unallocated space on the physical hard drive upon which filePro is running, which space can be used for writing new data items. Mr. Scheel will further explain that when a filePro user writes new data, a free chain will determine where on the physical disk that data will be stored. Mr. Scheel will explain that when filePro records are deleted, a free chain will designate the deleted records as available for future use in recording data. Mr. Scheel will also define the concept of an index, which is filePro's fundamental method for locating data. Mr. Scheel will explain that free chains use the index to locate data within a filePro database that is available for writing new information.

Mr. Scheel will also explain that filePro databases often suffer from free chain errors, which is a generic term for problems that arise in which the free chain system attempts to find the next available record for writing new data but is unable to do so. Mr. Scheel will state that filePro's built-in error correction and error checking is not sophisticated, and therefore, filePro lacks a uniform method for diagnosing and remedying free chain errors. Mr. Scheel will further explain that filePro is configured to alert users to free chain errors through dialogue boxes, but these boxes offer no concrete information for remedying or even diagnosing the cause of the free chain error. Thus, Mr. Scheel will opine that when free chain errors arise in filePro, the filePro system itself will not identify either the cause of the error or the method for remedying it.

Mr. Scheel will further state that when a free chain error arises in a filePro database, filePro itself may or may not successfully detect that error. Mr. Scheel will explain that when filePro detects a free chain error, filePro will crash and cannot resume operations until the free chain error is corrected. Mr. Scheel will further explain that filePro cannot operate when there is an unremedied free chain error due to the risk of free chains erroneously designating data the user intends to save as free records that can be overwritten with new data. If such a problem is not remedied, Mr. Scheel will explain, there is a risk that users entering new data into filePro

---

[3] Mr. Scheel's training and experience is summarized in the curriculum vitae that has already been provided to you.

Nancy Rue, Esq.
Patrick Murray, Esq.
Assistant U.S. Attorneys
February 28, 2017
Page 4

would overwrite or corrupt existing data that was saved and that the user did not intend to modify. Additionally, Mr. Scheel will state that if a free chain or indexing error arises and filePro does not detect it, there is a risk that records will be deleted or corrupted as users enter new data.

Regarding the cause of free chain errors, Mr. Scheel will state that free chain errors can arise because the physical disk upon which filePro's data is stored runs out of available storage. Mr. Scheel will explain that when space on a physical disk runs out of available storage, free chain errors can occur because the lack of any free space in which to record new data means that filePro's free chain system is unable to find any available space for writing new files.

Additionally, Mr. Scheel will explain that if the physical disk upon which filePro is storing data is old, it may be necessary to use wiping software to remove data from the server to free up space and remedy free chain errors. Mr. Scheel will explain that if data has been stored on a physical disk for a long period of time without being overwritten, it may resist efforts to delete it through means other than purging or wiping software. Mr. Scheel will further explain that this particular problem related to data resisting deletion efforts tends to arise on older computer equipment. Furthermore, Mr. Scheel will explain that archiving data would not pose a solution to free chain errors caused by low physical disk space because archiving merely moves data from one place on a physical disk to another, and therefore does not result in a net increase of total available physical disk space.

Based on the foregoing, Mr. Scheel will opine that using wiping software to target unallocated space on a disk drive is a technologically sound and appropriate method for remedying free chain errors that exist in filePro.

Very Truly Yours,

Robert M. Radick

cc:    Counsel of Record (by email)

**Exhibit D**

# MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

ELKAN ABRAMOWITZ
RICHARD F. ALBERT
ROBERT J. ANELLO*
LAWRENCE S. BADER
BENJAMIN S. FISCHER
CATHERINE M. FOTI
PAUL R. GRAND
LAWRENCE IASON
BRIAN A. JACOBS
JUDITH L. MOGUL
JODI MISHER PEIKIN
ROBERT M. RADICK*
JONATHAN S. SACK**
EDWARD M. SPIRO
JEREMY H. TEMKIN
RICHARD D. WEINBERG

565 FIFTH AVENUE
NEW YORK, NEW YORK 10017
(212) 856-9600
FAX: (212) 856-9494

www.maglaw.com

WRITER'S CONTACT INFORMATION

(212) 880-9558
rradick@maglaw.com

COUNSEL
JASMINE JUTEAU
CURTIS B. LEITNER
JACOB W. MERMELSTEIN
DANIEL F. WACHTELL

ROBERT G. MORVILLO
1938-2011
MICHAEL C. SILBERBERG
1940-2002
JOHN J. TIGUE, JR.
1939-2009

*ALSO ADMITTED IN WASHINGTON, D.C.
**ALSO ADMITTED IN CONNECTICUT

March 5, 2017

**By Email**

Nancy Rue, Esq.
Patrick Murray, Esq.
Assistant U.S. Attorneys
United States Attorney's Office for the Eastern
   District Pennsylvania
615 Chestnut Street, Suit 1250
Philadelphia, PA 19106

      Re:    *United States v. Devos Ltd., d/b/a Guaranteed Returns, Dean Volkes, Donna*
            *Fallon, and Ronald Carlino,* Crim. No. 14-574

Dear Ms. Rue and Mr. Murray:

      On behalf of Devos Ltd. d/b/a Guaranteed Returns, Dean Volkes, and Donna Fallon (collectively, the "defendants"), pursuant to Federal Rule of Criminal Procedure 16(b)(1)(C) and the Court's order dated February 1, 2017 (Dkt. #213), we write to provide the government with a supplemental summary of the anticipated opinions and expert testimony of defense expert Louis Cinquanto.[1]

      Based on his extensive experience and training as a forensic examiner, which is summarized in the curriculum vitae that was previously provided to you, Mr. Cinquanto will offer a definition of electronic data and a description of how data is maintained on computer equipment through storage drives. Mr. Cinquanto will explain the general concept of electronic data, the logical size of computer data, and the allocation size used when files are written to a storage drive. Mr. Cinquanto will further define the concept of free space on a storage drive, which is the portion of a disk that is unused, and fileslack (also referred to as "slack space"),

---

[1] The defendants reserve the right to supplement, amend, or expand upon this disclosure as circumstances warrant. Additionally, the defendants are preparing supplemental notices regarding further anticipated expert witnesses, and will provide those notices to you as they are available.

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.
Nancy Rue, Esq.
Patrick Murray, Esq.
Assistant U.S. Attorneys
March 5, 2017
Page 2

which is the unused space on a data cluster that exists when the logical file space is less than the physical file space.

Further, Mr. Cinquanto will describe the difference between the soft deletion of data from a storage drive, on the one hand, and the purging or wiping of data, on the other. Mr. Cinquanto will explain that a hard drive contains two types of space, allocated and unallocated – the latter of which contains the portion of the drive where new data can be stored, and the former of which is the portion of the drive that holds data that is to be saved and thus not overwritten when new data is created. Mr. Cinquanto will explain that when data is soft deleted – or, using terms familiar from Apple and Windows operating systems, sent to the trash or recycling bin – this data remains on a storage disk in the unallocated space, where it can be potentially overwritten by new files or could continue to exist indefinitely if it is not overwritten. Mr. Cinquanto will further explain that when data is purged, it is overwritten with either random or meaningless strings of symbols, and therefore cannot be recovered after purging because it no longer exists. Additionally, Mr. Cinquanto will describe the concept of a multiple pass wipe, which means that purging software accesses each sector of a hard drive targeted for deletion multiple times during a purge to ensure that the data is wiped. Mr. Cinquanto will state that a seven-pass wipe is considered the most secure method for purging data.

Mr. Cinquanto will state that based on his training and experience as a forensic examiner, businesses and government entities will wipe or purge data, in conjunction with other processes such as defragmentation, to address performance problems caused by low disk space or to protect sensitive or confidential data. Mr. Cinquanto will further explain that low disk space on a server can be caused by the buildup of old data fragments, and that wiping the server's free space using purging software would enhance the efficiency of defragging software by creating clear space. Mr. Cinquanto will explain that there are several widely available pieces of software for purging.

Mr. Cinquanto will explain that some wiping programs contain an option that allows a user to create a log file recording the operations of the program. Mr. Cinquanto will describe a log file as a text file generated by wiping software that records processes that have been configured and initiated, as well as the results of those processes. Mr. Cinquanto will explain that log files are useful for maintaining a record regarding the data that was successfully deleted by purging software.

Mr. Cinquanto will inform the jury that he received a forensic copy of the QPH5 server, reference number PHRCFL-11-203, for forensic examination, and that he loaded the forensic image onto his own computer equipment. Using this forensic image, Mr. Cinquanto will explain to the jury that he was able to examine the data stored on the server as it existed on the day of execution of the government's search warrant in April 2011, and was also able to run programs that were installed on the server and examine their configuration as of the day of the search warrant's execution.

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

Mr. Cinquanto will explain that the QPH5 server contained a physical hard drive that was split into two partitions, a C Drive and a D Drive. Mr. Cinquanto will tell the jury the D Drive was named "data" and had a size of 322 gigabytes, and that the C Drive had no name and a size of 19 gigabytes. Based on his review of the server and analysis of its contents, Mr. Cinquanto will opine that the C Drive was used to store and execute software programs by users who accessed the server, and that the D Drive was used to store data such as documents, emails, and other text files. Mr. Cinquanto will opine that based on his review of the QPH5 server, there is evidence that server errors had occurred at several points in time due to low disk space, and that in response to these problems, the registry on the server shows that a user utilized defragging software known as "Disk Keeper" or "Defrag." Additionally, Mr. Cinquanto will opine that on March 26, 2010, Disk Keeper was run from the user account "sellich" to perform defragmentation on the QPH5 server.

Mr. Cinquanto will describe for the jury a particular piece of wiping software known as BCWipe, and explain that it conducts a seven pass wipe of data on a hard drive, and can be configured to target either the free space on a disk or the slack space, or to do a full disk wipe of an entire drive. Mr. Cinquanto will explain that Version 4 of BCWipe has an additional feature that cleans the Master File Table of a drive upon which it operates. Mr. Cinquanto will define a Master File Table as a database that, like a directory, contains information about how to access each file on a drive, and will explain that BCWipe Version 4 removes entries from a Master File Table for files that have been deleted. Mr. Cinquanto will explain that removing such entries from the Master File Table increases system performance by decreasing the number of entries that the system must sort through in order to locate a particular file.

Based on his review of the QPH5 server, Mr. Cinquanto will opine that the accounts "rcarlino," "ddettmann," "kahrens," "sellich," and an administrator account accessed that server and ran or installed BCWipe or defragmentation software in March 2010. Additionally, Mr. Cinquanto will opine that based on his review of the QPH5 server, Version 4.01.11 of BCWipe was installed on the server on March 25, 2010 by the user account "sellich." This opinion is based on the presence of data in the operating system's registry establishing that the "sellich" account navigated to a path called "name HDD" and accessed the installation program for BCWipe. Mr. Cinquanto will further explain that Version 4.01.11 of BCWipe can be configured to create log files, but that log files will only be generated if the user accesses a dialogue box before a purge and affirmatively checks a box requesting that BCWipe create a log. Additionally, Mr. Cinquanto will explain that if BCWipe is not configured to produce a log file, BCWipe will still write data to the registry of the computer upon which it is installed indicating that it was run at a particular time, but unlike a log, this data will only record the time of use.

Mr. Cinquanto will opine that BCWipe was never used to wipe anything more than a negligible amount of data from either the C Drive or the D Drive of the QPH5 server. Mr. Cinquanto will explain that he reviewed the log file in evidence as Government Exhibit 2-82, and

Nancy Rue, Esq.
Patrick Murray, Esq.
Assistant U.S. Attorneys
March 5, 2017
Page 4

that this log file shows that on March 29, 2010, BCWipe was configured to wipe the free space and file slack on the D Drive, but was only used for a total of seven minutes before it was cancelled by the user kahrens, and only used to wipe the free space on the D Drive for fifty-five seconds of those seven minutes. Mr. Cinquanto will state that this amount of time would not be enough for BCWipe to remove any significant amount of data from the D Drive. Mr. Cinquanto will further opine that although data stored on the QPH5 server's registry shows that BCWipe was accessed by the admin account and run on March 28, 2010 without log files enabled, it is his opinion that this unlogged use of BCWipe also did not purge any significant amount of data from the C Drive or D Drive. Mr. Cinquanto will explain that he reached this conclusion because he did not discover any space on the QPH5 server that contained arrays of characters or overwritten files that were consistent with wiping, and that he was able to recover a large quantity of old files from the unallocated free space on the D Drive, proving that such files were not successfully purged by BCWipe.

Very Truly Yours,

Robert M. Radick

cc:     Counsel of Record (by email)

# Exhibit E

Thomas A. Kissane
Partner

212 612-1213
TKissane@schlamstone.com

**SCHLAM STONE & DOLAN LLP**

26 Broadway, New York, NY 10004
Main: 212 344-5400   Fax: 212 344-7677
schlamstone.com

March 2nd, 2017

<u>BY EMAIL</u>
Nancy Rue, Esq.
Patrick Murray, Esq.
Assistant U.S. Attorneys
United States Attorney's Office for the Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

Re:    *United States v. Devos Ltd., d/b/a Guaranteed Returns, Dean Volkes, Donna Fallon,*
       *and Ronald Carlino,* Crim. No. 14-574

Dear Ms. Rue and Mr. Murray:

Pursuant to Fed. R. Crim. P. 16(b)(1)(C)(i), defendants United States v. Devos Ltd., d/b/a Guaranteed Returns, Dean Volkes, and Donna Fallon (collectively, "Defendants") provide notice that, should there be a defense case, they may call the below-listed expert witness. Defendants reserve the right to amend or supplement the summaries of such testimony as set forth below or designate additional expert witnesses as necessary.

**Edward M. Harrington, Brigadier General, U.S. Army (ret.)**

1) <u>Qualifications.</u> BG Harrington is a former senior U.S. Army officer with more than thirty years of experience in contracting and contract management and military logistics operations worldwide. He currently serves as the Managing Director of EMH and Associates, LLC, and has previously acted as Senior Vice President for Contracts for DynaCorp-International.

   During BG Harrington's period of military service, he served as the Director, Defense Contract Management Agency (DCMA), as well as in Program Executive Officer positions in both the DoD and the Army (TACOM). His duty responsibilities included overseeing management of and contracting for, among other things, military service weapon systems, radar and IT programs, and service contracts, as well as NASA, defense agency (DLA, DISA) and foreign military sales and allied cooperative and security assistance contracts while reporting to the Under Secretary of Defense (Acquisition, Technology and Logistics) in DoD and to the Army's Assistant Secretary-Acquisition, Logistics and Technology.  As an army logistics officer, BG Harrington led and managed deployed operations worldwide, providing all classes of military supplies,

logistics services, and base camp facilities, air, sea and ground transportation and equipment sustainment.

BG Harrington holds a B.S. in Management from the Northeastern University, Boston M, as well as an MS in Acquisition and Contracting from the Florida Institute of Technology.  He is a graduate of the Army's Senior Service College Fellowship, University of Texas-Austin.

2) <u>Summary of Opinions and Bases Thereof</u>. It is anticipated that BG Harrington would, if called as a witness, offer testimony, based on his extensive experience, as to the standards and practices of government contracting, including the process undertaken by the Department of Defense when a contract need is identified, when a contract is entered, and when a contract is modified.  He will explain whether or how services extrinsic to the formal Statement of Work on a government contract may be incorporated into that contract.  He will opine that the processes followed with respect to the 2001 DoD contract, as reflected by the DoD contract file, were insufficient to modify the contract or the Statement of Work so as to impose a duty to manage indated pharmaceuticals.

Very truly yours,

Thomas A. Kissane

<u>Copies To:</u>
Elkan Abramowitz, Esq.
Robert M. Radick, Esq.
Robert Cleary, Esq.
William C. Komaroff, Esq.
BY EMAIL

**Exhibit F**

# RAYMOND P. SCHEEL

61 Whispering Pine
Huntsville, TX 77320
(936) 662-5465
raymond.scheel@gmail.com

## Director – Educational/Information Technology

Technical / Educational Administrator with extensive experience in educational environments seeking an opportunity exercise broad, practically developed, knowledge of analytics and information technology as applied to education.

## Technical Experience:

**Learning Management Systems:** Pearson eCollege, Blackboard 6.x, Blackboard Learn 9.x.

**Content Management Systems & Integrated Applications:** ProctorFree, Tegrity Lecture Capture and Remote Proctoring, Kaltura, Blackboard Collaborate, CourseSmart, McGraw Hill Connect, NBC Learn, Pearson MyLabs, Adobe Presenter, Respondus Test Management, Respondus Lockdown Browser, Campuspack

**Data Handling:** filePro Plus RDMS, mySQL, MS Excel/VBA, Oracle, Uniface, Informix, and Access. Data conversion between XML and, various "flat file" formatting standards.

**Productivity, Design, & Office Software:** Dreamweaver, Fireworks, Freehand, Acrobat Professional, Distiller, and PageMaker. Office suites and graphics packages on major OS platforms.

**Development and Application environments:** Eclipse and Zend development frameworks. Practical experience in support and enhancement of various open source software applications such as Joombla and osCommerce.

**Hardware:** Maintain, support, and upgrade PC's, servers, terminals, printers and associated software. Languages include Visual Pascal (Delphi), Java, HTML, PHP, JavaScript, shell scripting.

**Practical Skills:** Organizational leadership, Trained educator, management reporting, project coordination, presentation delivery.

**Operating Systems and Shells:** Administration and use of SCO UNIX/XENIX, RHE/SuSE/Ubuntu Linux, MS Windows, and Mac OS. Advanced use of XP and Solaris, comfortable in mainframe environments.

## Work Experience:

| | |
|---|---|
| 2016-- | **Assistant Director for Course Design - SHSU Online, Sam Houston State University, Huntsville, TX.**<br><br>Oversaw a group of instructional design professionals performing eCourse development and management in Blackboard Learn for for SHSU Online (originally called the DELTA Center). Train subject matter experts on elements of Blackboard Learn and 3rd party tools both individually and formal group training sessions. |
| 2015-2016 | **Instructional Designer, Team Lead - SHSU Online, Sam Houston State University, Huntsville, TX.**<br><br>Lead /senior role performing eCourse development and management in Blackboard Learn. Train subject matter experts on elements of Blackboard Learn and 3rd party tools both individually and formal group training sessions. Guided other team members on copyright compliance and intellectual property considerations |
| 2011-2015 | **Instructional Designer - SHSU Online, Sam Houston State University, Huntsville, TX.**<br><br>Performed eCourse development and management in Blackboard Learn . Trained subject matter experts on elements of Blackboard Learn and 3rd party tools both individually and formal group training sessions. Monitor compliance with applicable copyright and intellectual property law in the courses I help develop. Actively participated in a migration of university online course content from Pearson eCollege and Blackboard 6.x to Blackboard Learn 9.x. Primary responsibility for converting and implementing paper and post correspondence courses in an online environment. |



DEFENSE
EXHIBIT
docfolio    USA v. DEVOS LTD. et al.    PID/6oKIPKr
DX0083

D0000092

DX0083-001

| | |
|---|---|
| 2005-2011 | **Database Applications Developer (Programmer V)- Windham School District, Texas Department of Criminal Justice – Institutional Division, Huntsville, TX.**<br><br>Database development and D.B.A duties. Continued performing more duties of prior position as Programmer III while assuming duties of yet another Programmer V position and then also those of the filePro D.B.A..<br><br>Led conversion of recurring reports manually generated by IT staff to a web presentation available on demand to the requesting end users. Created interface by which developers working in Oracle could transparently access live data in the legacy filePro database tables. |
| 2003-2005 | **Programmer III - Windham School District, Texas Department of Criminal Justice – Institutional Division, Huntsville, TX.**<br><br>Database Applications Programmer and web design / management. Move to I.T. followed an organizational restructuring in the wake of a reduction in force in which I continued to perform my duties from Operational Support as well as assuming the bulk of the workload of a Programmer V.<br><br>Represented organization at and gave a presentation for a U.S. Department of Education conference focusing on use of technology use and administration in correctional education |
| 2000-2003 | **Programmer III - Windham School District, Texas Department of Criminal Justice – Institutional Division, Huntsville, TX.**<br><br>Database Applications Programmer and web design / management. Gather and analyze data and prepare reports on all aspects of organizations operations for internal in inter-agency use as well as for publication and reporting to the state legislature. Publish organizational annual reports & summary reporting of individual locations. Advised decisions creating and then maintained the organization's result-based accountability procedures. Led staff training on accountability system and other aspects of organization's policies and procedures. Setup, supervision, and user training of video conferences. Also continued most duties from prior position as Evaluation Specialist<br><br>Assist with remotely hosted web and Internet email and its interaction with our network. Technical oversight of publishing a monthly news magazine distributed to institutional facilities statewide (The ECHO distribution of 130,000+ copies per issue). Monitor and analyze relevant legislative activity. |
| 1998-2000 | **Evaluation Specialist - Windham School District, Texas Department of Criminal Justice – Institutional Division, Huntsville, TX**<br><br>Executed compliance audits and provided explanations of existing policy to principals and other administrators. Organizational policy development and interpretation for new areas. Assisted staff with daily operational challenges. Database programming and analysis of generated reports regarding the organization's operations. Reworking and standardization of web site program code. Spot reports and information automation.<br><br>Assumed lead preparation of organizations Annual Performance Report & Campus and District Profiles, including automation of assembling the data and layout. Implemented reporting and result-based analysis / automated audit system for unit level accountability procedures based on requirements and goals of organization's policies and procedures. Setup and supervision of video conferencing facility Maintained organization's web site, supervised training of employees from other departments posting to the web site, and enhanced integration with daily internal operations. |

D0000093

| 1996-1998 | **System Support Specialist IV - Windham School District, Texas Department of Criminal Justice – Institutional Division, Huntsville, TX** |
|---|---|
| | Feb 1996 - September 1997: Unix administrator and help desk. Administered multiple remote UNIX systems and associated network hardware. Completed SCO UNIX System V Administration course. Support principals, counselors, and other users of various office applications and database systems. Performed system upgrades, installations, troubleshooting and maintenance referrals. Manage user accounts, write and modify shell scripts. Ensure appropriate physical and technical security measures were in place according to organization's policies and procedures. |
| | Assisted in employee supervision of a special project involving an inmate programming and technical writing team when not engaged in work related travel. |
| | October 1997-Aug 1998: Worked as a junior programmer doing year 2000 remediation on a statewide database application handling inmate education data and varied database programming using filePro. Coordinated changes with other programming staff. Assisted regional support personnel resolve issues that arose at specific locations. Received in house training on programming in the Uniface/Informix environment and outside training in filePro. |
| 1994-2012 | **Technology Services Consultant – Scheel Media Solutions, Huntsville, TX** |
| | Internet site development, e-commerce implementations, application development, web hosting, and graphic design. Computer training and troubleshooting including network configuration, hardware updates and software installations on MS Windows and Linux systems. Photography and imaging. |
| Fall 1995 | **Student teaching – Angleton ISD – Angleton, TX** |
| | Student teaching internship. Primary instructional responsibility for 6 classes of computer programming and keyboarding. Improved security of classroom network and advised the principal on purchases of technology resources for the campus to accomplish the instructional goals while remaining in budget. |

**Education:**
- **B.S. Computer Science - Texas A&M University - 1995**. Minor: History & Secondary Ed.
- **M.Ed. Instructional Technology** (currently enrolled) - **Sam Houston State University** - Expected completion Summer 2018

**Invited Presentations**
- "Data Collection and Analysis by the Windham School District to Improve Education Program Effectiveness and Outcomes in the Texas State Prison System." U.S. Department of Education, Office of Safe and Drug-Free Schools. "Making Data Work for You" Technical Workshop. Annapolis MD. June 2006.
- " PBS Learning Media as a Source for Classroom Resources." Faculty Development Day, Center for Teaching and Learning Excellence. Lee College, Baytown. August 2014.

**Conference Presentations**
- "Using PBS LearningMedia for Instructional Content and Professional Development" #FUTUREREADY Region VI Education Service Center Technology and Digital Learning Conference.. Huntsville, TX. July 2015.

**Memberships and Community Involvement:**
- Texas Distance Learning Association (TxDLA)
- Member, Local Employee Committee, Texas Pine Belt - State Employee Charitable Campaign, 2015 - Present
- Cubmaster of Pack 96 since 2008, Scoutmaster of Troop 97 since 2013
- Past President of Board of Directors, The Good Shepherd Mission, Huntsville TX
- Editor for the Mozilla Open Directory Project.

D0000094

**Exhibit G**

# Sophia Pasedis B.S., Pharm. D., R.Ph.

401 Quincy Shore Drive, Quincy MA.

(508) 380-8862

Pharmacist004@gmail.com

## INTRODUCTION

Dr. Pasedis has over twenty five years diverse experience as a registered pharmacist in leadership roles in retail and hospital pharmacies. Currently, she is in the healthcare consulting industry. Her practice includes expert witness services, pharmacy system improvements, drug procurement and distribution systems, medication security with an emphasis on controlled substances, vendor relationship and contracting, federal and state pharmacy regulations and pharmacy standards of practice.

Dr. Pasedis served two consecutive terms on the Massachusetts Board of Registration in Pharmacy and also served on the Massachusetts Board of Medicine Patient Care Assessment Committee for three terms.

**Legal Experience & Services**

Dr. Pasedis has served as an expert witness and has experience testifying on the following types of legal issues:

Intellectual Property litigation (drug)

Pharmacy standards of practice

Pharmacy malpractice

Drug-related medical malpractice

Medication error event reconstruction

Drug product liability (e.g. packaging, design/formulation)

## EDUCATION

**Massachusetts College of Pharmacy and Health Sciences University**
- B.S. in Pharmacy

**Xavier University College of Pharmacy**
- Doctor of Pharmacy Magnum cum Laude (Pharm.D.)

## LICENSES

- Licensed Pharmacist in Massachusetts (good standing-no violations)
- Licensed Pharmacist in 12 states (expired- no violations)



**DEFENSE EXHIBIT**

USA v. DEVOS LTD. et al.

DX0085

PID46oKfPIkrt

docfolio

D0000097

DX0085-001

## BOARD EXPERIENCE

**Massachusetts Board of Registration in Pharmacy**                    **2004- 2013**
- Two Term Member, President in 2008, Secretary 2005

**Massachusetts Board of Medicine**                                    **2004-2013**
- Three Term Member of The Patient Care Committee

**Massachusetts College of Pharmacy Corporation**                      **2009-present**
- Board Member Trustee

**Hellenic Nursing and Rehabilitation Center**                         **2010-present**
- Board Member Trustee

**Women's Benevolent Association**                                     **2010-present**
- Executive Board Member


## EXECUTIVE COMMITTEE EXPERIENCE

- National Association of Boards of Pharmacy (NABP)
- Council of Boston Teaching Hospitals Directors of Pharmacy (COBTH)
- VHA Novation Pharmacy Purchasing Group– Contract Evaluation Group
- Served on multiple national speaking platforms on pharmacy standards of practice, sterile compounding and proposed regulations.
- Patient Quality and Safety Committee – State's hospital review team


## PROFESSIONAL WORK EXPERIENCE

**Healthcare Invesco LLC, Quincy, MA.**                                **2003-Present**
**Principal Consultant**

- Mock Audits and Gap Analysis- Board of Pharmacy Mock Audits, DEA Risk Assessment, cGMP Quality Systems Analysis
- SOP Development and Implementation- SOP Analysis
- Drug Procurement, Distribution, and Security of Controlled Substances
- Vendor Relationships and Contracts
- Expert Litigation Services

D0000098

**Ameridose LLC, Framingham, MA.**                                     **2005-2014**
**Vice President of Regulatory Affairs and Compliance, Vice President of Operation**

- Pharmacist in charge of a national pharmacy provider of sterile admixtures and oral repackaging services to hospital pharmacy departments.
- Executive of a multi facility, 750 employee operation that served 52 states and US territories.
- Company's national speaker and regulatory spokesperson.
- In charge of vendor relations and contracts at the executive level.
- Responsible for federal and state regulatory reporting for 52 states and controlled substance accountability.
- Oversaw all controlled substance accountability, procurement and waste.
- Developed initial standard operating procedures and created and maintained an annual compliance plan that promotes quality, productivity and performance.
- Managed operational risks by preventative risk analysis, internal and external vendor audits, corrective action plans, regulatory compliance improvement programs that will include plan implementation and continuous monitoring.

**Franciscan Children's Hospital**                                     **2009-2010**
**Interim Pharmacist**
- Completed pharmacy operational requirements by organizing and directing technicians' work; verifying their preparation and labeling of pharmaceuticals; verifying order entries, conducting drug utilization reviews, and unit inspections.
- Conducted inventory review, removed outdated and damaged drugs

**South Shore Hospital, Weymouth, MA.**                                **2004-2005**
**Executive Director of Pharmacy Services**
- Responsible for pharmacy services to 362 bed acute care medical and surgical teaching hospital, large ER trauma center, multiple off site ambulatory clinics and ambulatory surgery center. 24/7 Pharmacy department, staffed with 72 FTE.
- Oversaw all aspects of the pharmacy department to ensured quality, patient safety, cost effectiveness and compliance with State and Federal laws and regulations.
- Worked with vendors to assure pharmacy's needs are addressed.
- Member of the senior leadership C Suite team, Co-chair of the Pharmacy Therapeutics committee and the TJC/DPH audit committee.
- Educated medical and nursing staff on documentation and security of controlled substances, formulary issues and general pharmacy systems education.
- Developed new medication procurement procedures for hospital ambulance service.

D0000099

**Massachusetts Eye and Ear Infirmary, Boston, MA**                    2000- 2004
    **Director of Pharmacy Services**
- 120 bed specialty Harvard teaching hospital, ER trauma center, multiple ambulatory clinics, and an ambulatory surgery center. The Pharmacy department staffed with 14 FTE with a combination of centralized and decentralized pharmacist and CPhTs.
- Developed and implemented policies and procedures to ensure the highest quality of patient care, cost effective therapies and efficient pharmacy services compliant with State and Federal laws and regulations.
- Oversaw all aspects of pharmacy budget including medication procurement and vendor contracts. Analyzed reports and developed new method of product utilization, vendor contracts and target purchasing across multiple sites for certain drug therapeutic categories to maximize market share for best pricing and to reduce overall drug cost and achieved real savings across multiple departments.
- Senior level hospital management team, Patient safety, Patient admissions team, TJC team, Human Studies Committee, Co-chair Pharmacy and Therapeutics Committee.
- Managed personnel through recruiting, hiring, and developing talented team members.

**Assistant Professor- Clinical**                    2000- 2006
**Massachusetts College of Pharmacy**
**Northeastern University, College of Pharmacy**
- Developed new innovative pharmacy residency training and teaching programs.
- Didactic lecturing in the Doctor of Pharmacy curriculum in a variety of therapeutic areas.
- Preceptor and evaluated introductory pharmacy practice experience (IPPE) and advanced pharmacy practice experience (APPE) students.
- Preceptor, and co-teaching of/with PGY-1 and PGY-2 pharmacy practice residents.

**Quigley Memorial Hospital for Veterans, Chelsea, MA.**                    1997-2000
    **Manager of Pharmacy Services**
- Responsible for providing quality long term nursing home pharmacy services to over 800 patients in a mixed acute care hospital, long term care facility, nurse assisted living facility with an ambulatory living facility.
- Performing the full range of pharmacy supervisory functions and dispensing.
- Improved pharmacy systems and implemented new continuous quality plans.

D0000100

**Veterans Administration Hospital, Boston, MA**                    **1996-1997**
**Staff Pharmacist**

- Performed staff pharmacist functions that included dispensing medication, drug utilization reviews, screened patient profiles for allergies, therapeutic duplications and appropriate medication doses.
- Worked closely with veterans on patient counseling and proper medication administration.

**Department of Defense, SOWEY Naval Air Station, MA.**            **1991-1996**
**Chief Pharmacist-Pharmacist in charge**

- Coordinated all pharmacy services, operations and workflow as well as dispensed medications, performed drug utilization reviews and suggested medication treatments.
- Improved pharmacy systems and implemented new quality protocols for pharmacy services.
- Managed pharmacy budget and assessed inventory needs.
- Maintained accurate records of prescriptions dispensed and ensured controlled substances are dispensed in compliance with the law and that inventory control and record keeping requirements are met.
- Conducted in-services to medical /clinic staff regarding formulary medication and pharmacy procedures.
- By changing the dispensing process, I was allowed the opportunity to work closely with patients and built a strong professional trusting relationship. Received recognition from the Secretary of the Navy for my work with patients.
- During BRACK closure I was involved with the military community outreach program and received recognition award for my services.

**Franciscan Children's Hospital, Brighton, MA**                   **1988-1991**
**Clinical Staff Pharmacist**

- Staff Pharmacist dispensing position as well as assisted in developing facilities first clinical pharmacist role. Participated in multidisciplinary team rounds and provides pharmacotherapy recommendations and dispensed medications.
- Researched information for P&T Committee formulary as requested by Director
- Provided medication information for nursing staff in critical care areas.
- Assessed inventory needs and removal of expired medications from pharmacy and nursing unit areas.
- Involved in developing an expired medication return direct to manufacturer procedure for pharmacy department.

D0000101

DX0085-005

# Exhibit H

**Contact Information**
Brian L. Berntson
Retired Special Agent Internal Revenue Service Criminal Investigation
Chicago Field Office, June 1991-August 2013
P.O. Box 1392
Bettendorf, Iowa 52722
Personal Cell: 563-508-0728
**blberntson@moneylaunderingconsultants.com**

**Highlights of Qualifications**
During his twenty-two year tenure as a Special Agent Brian L. Berntson has personally
conducted more than fifty complex money laundering investigations involving a wide
range of specified unlawful activities to include: drug trafficking, social security fraud,
theft of government funds, theft of bank funds, illegal gambling, alien harboring, bank
fraud, bribery, wire and mail fraud, major fraud against the government, procurement
fraud, and public corruption. Additionally, he has provided money laundering technical
assistance to his fellow special agents and other money laundering experts, and has
assisted numerous money laundering investigations and investigations involving
violations within Title 31 of the United States Code.

**Education & Training**
In June 1990, Special Agent Berntson received his Bachelor of Arts degree in Sociology
with an emphasis in Law and Criminology from the University of Minnesota. In addition
to his degree, extensive course work in accounting and business law were also received.
In 1991 and 1992 Special Agent Berntson attended the Federal Law Enforcement
Training Center and received basic training. The basic training included: methods used in
criminal investigations, financial investigative techniques, methods of proof in criminal tax
and money laundering investigations, other financial crimes to include Bank Secrecy Act
violations, and legal training involving money laundering, taxation and seizure and forfeiture
statutes.

In October 2001 Special Agent Berntson received advanced money laundering training
in Washington D.C. and has been a member of the Internal Revenue Service, Criminal
Investigation, Money Laundering Expert Witness Cadre for twelves years until his
retirement.

In March 2004 Special Agent Berntson attended the Advanced Money Laundering
course at the Department of Justice, National Advocacy Center.



DEFENSE
EXHIBIT
USA v. DEVOS LTD. et al.
DX0086
docfolio
PID:6oKfPlKr

D0000102

DX0086-001

Annual attendance at the Money Laundering Alert's International Money Laundering Conference from 2002 through 2006 in which international money laundering issues to include, Black Market Peso Exchanges, debit cards, value stored cards, off shore banking, the Patriot Act, FINCEN's regulatory role, OFAC, and trends in money laundering methods are some of the topics of discussion.

In May 2008, Special Agent Berntson assisted in the organization and the training for IRS money laundering expert witness cadre members to include being a member on a money laundering discussion panel, organization of course materials and evaluation of the expert witnesses during the mock trials.

In June 2011, Special Agent Berntson assisted in the course curricula and training for the new IRS money laundering expert witness cadre members to include a panel to discuss trial preparation and courtroom testimony, resume building, organization and compilation of course materials and evaluation of expert witness candidates during the mock trial exercises.

In June 2012, Special Agent Berntson received the Certified Anti-Money laundering Specialist (CAMS) certification through the Association of Certified Anti-money Laundering Specialist (ACAMS) organization.

**Experience**
During his tenure as a money laundering expert witness Special Agent Berntson has been qualified as a money laundering expert witness and has provided expert testimony on seven separate occasions in the Southern District of Iowa (twice); District of Minnesota (twice); Eastern District of Virginia, Northern District of Illinois, Eastern Division and the Middle District of Pennsylvania. The cases involved drug trafficking, extortion, structuring, wire and mail fraud, and bribery.

Special Agent Berntson also had significant trial experience, seven cases, as a case agent in both tax and money laundering cases involving white collar, narcotics, witness tampering, witness tampering conspiracy, bribery, alien harborting and other violations. Special Agent Berntson has testified numerous times as the case agent and obtained guilty verdicts in all of his cases.

Special Agent Berntson was one of four IRS-CI agents selected for a three month detail in Washington D.C. in 2010 to assist in establishing the Global Illicit Financial Team (GIFT) which is a new IRS-CI lead task force established at the direction of the Attorney General's Organized Crime Counsel to target International Organized Crime and professional money launderers worldwide. Amongst other things, Special Agent Berntson

D0000103

DX0086-002

provided technical assistance in conducting offshore money laundering investigations, forfeiture of assets offshore and assisted in the compilation of a reference manual for conducting off shore money laundering investigations.

Also during his career Special Agent Berntson was assigned to Operation LOGJAM a task force which consisted of Federal Bureau of Investigations, Army Criminal Investigation Division and Defense Criminal Investigation Service. The LOGJAM task force was designated by the Department of Justice to investigate all matters related to the LogCap III contract issued by the Army Support Command at the Rock Island Arsenal which provided logistical support to the United States military in Iraq, Kuwait and other theaters. During his tenure on the LOGJAM Task Force Agent Berntson was an investigative team leader that coordinated and directed the investigative activities of task force members related to major fraud against the government, wire and mail fraud, bribery, witness tampering and conspiracy and other offenses related to Operation Iraqi Freedom contracting.

Special Agent Berntson also conducted international travel to Kuwait and London, and was the member of a team which conducted an undercover operation in London with the assistance of New Scotland Yard relating to a fraud case relating to Operation Iraqi Freedom which lead to the prosecution of two co-conspirators.

Special Agent Berntson was also member of the Joint Terrorism Task Force (JTTF) and has also assisted the Federal Bureau of Investigation in Foreign Counter-Intelligence international investigations and he held a Top Secret clearance since September 2001 until his departure from the government in August 2013.

**Publications & Presentations**
Article published on Association of Certified Anti-Money Laundering Specialists (ACAMS) website, "The Element of Interstate Commerce as it Relates to Money Laundering Crimes", December 2002.

Article published in Money Laundering Alert's International Money Laundering Conference materials, "Investigative Techniques Utilized in a Money Laundering Investigation", February 2006.

Presentation on The USA Patriot Act as it relates to Money Laundering and Terrorism Investigations, May 2002 at the Rock Island Arsenal.

Presentation to Asset Forfeiture Money Laundering Section and Asset Forfeiture Coordinators, Midwest Region on U.S. v. Pizano, Money Laundering and Asset

D0000104

DX0086-003

Forfeiture Aspects of the Investigation, November 2005.

Presentation at Money Laundering Alert's International Money Laundering Conference, Investigative Techniques Utilized in a Money Laundering Investigation, February 2006.

Presentations on money laundering as it relates to drug conspiracies for law enforcement officers in Illinois. The training was sponsored by the United States Attorney's Office for the Central District of Illinois, February and May 2007, and June 2009.

Presentation at a financial investigative course for state prosecutors and law enforcement officers in Illinois regarding money laundering in white collar and drug conspiracy investigations. The training was sponsored by the United States Attorney's Office for the Central District of Illinois, May 2007.

Presentation on money laundering to law enforcement students at Western Illinois University as it relates to White Collar crime November 2007.

Presentation on money laundering and financial investigative techniques to federal, and state law enforcement officers, military personnel and financial institution compliance officers at the Rock Island Arsenal, June 2008.

Presentation on money laundering as it relates to real estate transactions and financial investigative techniques to the Iowa Land Title Association, October 2008.

Presentation to federal, state, local law enforcement officers on money laundering as it relates to casino money laundering, September 2009.

Presentation on State of Iowa and Illinois money laundering statutes, federal money laundering statutes and financial investigative techniques to state and local law enforcement officers, November 2009.

Presentation at the Iowa Law Enforcement Academy to state and local law enforcement officers on money laundering statutes and financial investigative techniques as it relates to white collar and other investigations, May 2010.

Presentation at the Department of Justice National Advocacy Center (NAC) Advanced Money Laundering Course to federal agents, and federal prosecutors on international money laundering investigations and forfeiture of assets offshore, June 2011.

D0000105

DX0086-004

Presentation to civilian and military intelligence officers, law enforcement agents/officers and procurement specialists on money laundering and financial investigations at the Rock Island Arsenal as it relates to counter-intelligence investigations and procurement issues, May 2012.

Presentation to U.S. Fish and Wildlife, Minnesota, North and South Dakota, and Wisconsin State game enforcement officers on federal and state money laundering statutes and financial investigations as it relates to wildlife violations to include the Lacey Act, July 2012.

Presentation to fifty-two U.S. Secret Service Agents at their training center in Beltsville Maryland on federal money laundering statutes, asset forfeiture, conducting financial investigations domestically and internationally as it relates to counterfeiting, wire, mail and credit card fraud and other violations that Secret Service has investigative authority, August 2012.

Presentation to all of the U.S. Fish and Wildlife Special Agents nationwide at the National Conservation Training Center (NCTC) located in Shepherdstown West Virginia, regarding money laundering and conducting financial investigations as it relates to wildlife violations to include the illegal import/export of prohibited items and Lacey Act, May/June 2013.

Presentation to Certified Public Accountants at the Praxity Conference in Orlando Florida regarding financial investigative techniques which can enhance litigation, November 2014.

**Forfeiture Experience**
Special Agent Berntson has extensive experience in asset forfeiture from administrative, civil judicial, and criminal forfeitures as well as multi-jurisdictional forfeitures located through out the United States. Additionally, Agent Berntson has worked closely with the Asset Forfeiture Money Laundering Section (AFMLS) and the Office of International Affairs (OIA) at the Department of Justice while attempting to seize a correspondent bank account of an offshore financial institution located in Pakistan relating to a procurement fraud case associated with Operation Iraqi Freedom. Special Agent Berntson also drafted the manual for seizing and forfeiting offshore assets, namely bank accounts during his detail at the Global Illicit Financial Team (GIFT) in Washington D.C. In one of Special Agent Berntson's narcotics investigations he seized $1.47 million of assets relating to a drug and money laundering conspiracy which spanned over ten years and the assets were located in multiple jurisdictions. Agent Berntson has also seized assets in white collar investigations relating to mail and wire fraud, bribery, major fraud against the Government and other violations. Additionally, Special Agent Berntson has testified

Page 5 of 6

D0000106

DX0086-005

numerous times in forfeiture hearings and has coordinated numerous multi-jurisdictional seizure investigations during his career.

**Professional Affiliations**
Member of the Association of Certified Anti-Money Laundering Specialists (ACAMS).

D0000107

DX0086-006

# Exhibit I

Last updated on 10/9/16

**CLAIRE OAKES FINKELSTEIN**
*Algernon Biddle Professor of Law and Professor of Philosophy*
*Center for Ethics and the Rule of Law (CERL), Director*
*University of Pennsylvania*
*3501 Sansom Street*
*Philadelphia, PA 19104*
*215-898-5798*
*cfinkels@law.upenn.edu*

## EDUCATION

| | | |
|---|---|---|
| and | 1993-1996<br>1989-91 | **University of Pittsburgh**, Department of Philosophy. Ph.d, Sept. 1996.<br>Director: David Gauthier. |
| | 1991-93 | **Yale Law School**, J.D., 1993. Articles Editor, YALE LAW JOURNAL. |
| | 1987-88 | **Columbia Law School**, First year of J.D. |
| | 1986-87 | **University of Paris, Sorbonne**, Department of Philosophy.<br>"Maître" (Masters) in philosophy, 1987. Graduated with High Honors. |
| | 1982-86 | **Harvard College**, B.A. 1986. Majored in philosophy and government.<br>Graduated *Magna Cum Laude*. |

## ACADEMIC POSITIONS AND VISITS

| | |
|---|---|
| 2009 *-present* | Algernon Biddle Professor of Law and Professor of Philosophy, University of Pennsylvania |
| July 2001-2009 | Professor of Law and Philosophy, University of Pennsylvania (Secondary Appointment in Philosophy since 2002) |
| January – July, 2008 | American Academy in Berlin, Siemens Fellow |
| 2000-2001 | Visiting Faculty<br>University of Pennsylvania Law School |
| 2000-2001 | Professor of Law<br>University of California, Berkeley (Boalt Hall) |
| Spring 2000 | Harsanyi Fellow, Research School for the Social Sciences (RSSS)<br>Australian National University. |
| 1995-2000 | Acting Professor of Law, University of California, Berkeley (Boalt Hall) |

1



DEFENSE EXHIBIT
USA v. DEVOS LTD. et al.
DX0087
dxdpdp
PID6oKlPkr

D0000108

DX0087-001

| 1998-1999 | Laurance S. Rockefeller Visiting Fellow |
|           | Princeton Center for Human Values, Princeton University |

| Summer 1998 | **Centre de Recherche en Epistemologie Apliquée** (CREA) |
|             | Paris, France, Visiting Fellow |

| 1989-1995 | **University of Pittsburgh**, Department of Philosophy. |


UNIVERSITY SERVICE (major duties only)

| 2012 – current | Founder and Director, Center for Ethics and the Rule of Law (CERL) University of Pennsylvania Law School, at https://www.law.upenn.edu/institutes/cerl/ |

| 2016 – 17 | Tenure and Promotions Committee, University of Pennsylvania Law School |

| 2016-17 | Academic Placement Committee, University of Pennsylvania Law School |

| 2015-16 | Faculty Senate Past Chair, University of Pennsylvania |

| 2015-16 | Co-Chair, Campaign for Community, University of Pennsylvania |

| 2014-15 | Faculty Senate Chair, University of Pennsylvania |

| 2013-14 | Chair-Elect of the Faculty Senate, University of Pennsylvania |

| 2011 – 2013 | Faculty Senate Executive Committee, Faculty Senate, At-Large Representative. |

| 2010 – 2013 | Faculty Senate Committee on Academic Freedom (SCAFR); Chair, 2011-2013. |

| 2009 – 2012 | Chair, Nominations Committee, Law School |

| 2001 – 2012 | Institute for Law and Philosophy, Director and Co-Director |

| 2010 – 2011 | Chair, Faculty Senate Committee on Open Expression |

| 2008-2009 | Chair, Educational Program Committee, Law School. |

| 2006-2007 | Chair, Senate Committee on Faculty and the Administration (SCOA) University of Pennsylvania (member since 2005) |

| 2006-2007 | Chair, Educational Program Committee. |

2

D0000109

DX0087-002

University of Pennsylvania Law School (member since 2004)

2003-2004        Appointments Committee, member
                 University of Pennsylvania Law School

## PUBLICATIONS & FORTHCOMING WORK

### BOOKS:

CONTRACTARIAN LEGAL THEORY, projected: Oxford University Press, 2017

SOVEREIGNTY AND THE NEW EXECUTIVE AUTHORITY, eds. Claire Finkelstein and Michael Skerker. Forthcoming, Oxford University Press, 2017.

ETHICAL DILEMMAS IN THE GLOBAL DEFENSE INDUSTRY, eds. Kevin Govern and Claire Finkelstein, Forthcoming, Oxford University Press, 2017.

Weighing Lives in War, eds. Jens Ohlin, Larry May and Claire Finkelstein, Forthcoming, Oxford University Press, 2017

CYBERWAR: LAW AND ETHICS FOR DIGITAL CONFLICTS, eds. Jens Ohlin, Kevin Govern, & Claire Finkelstein (forthcoming, Oxford University Press, 2015).

TARGETED KILLING: LAW AND MORALITY IN AN ASYMMETRICAL WORLD, eds. Claire Finkelstein, Jens Ohlin, and Andrew Altman, Oxford University Press (2014).

HOBBES ON LAW, ed. Claire Finkelstein, Ashgate Publishing (2005).

### PROFESSIONAL REPORTS:

Report on Ethical Challenges on the Treatment of PTSD and Opioid Addiction, CERL Briefing Paper, submitted to Governor Tom Wolf, September 2016.

Report for British Law Commission on American Murder Law, Completed September, 2005 (available upon request), published in British Law Commission CP177 (December 20, 2005).

### ARTICLES:

*Privacy, Transparency and the Rule of Law*, in Sovereignty and the New Executive Authority, eds. Claire Finkelstein and Michael Skerker, Forthcoming, Oxford University Press, 2017

*Responsibility for Acts of War and the Moral Equality Thesis*, in Symposium

3

D0000110

DX0087-003

Issue on the Morality of Aggression, in 32 Soc. Phil. & Pol'y, 184 (2016)

*Towards a Contractarian Theory of Law, in* Law and Social Economics: Essays in Ethical Values for Theory, Practice and Policy, Palgrave Publishing, ed. Mark D. White, 2015.

*Responsibility and the Doctrine of Double Effect,* ed. Enrique Villenueva, Law and the Philosophy of Action, Rodopi Publishers, 2014.

*Introduction to* Cyber War: Law and Ethics for Virtual Conflicts, Jens David Ohlin, Kevin Govern and Claire Finkelstein eds., Oxford University Press, 2015.

*Hobbesian Legal Reasoning and the Problem of Wicked Laws,* in Hobbes Today, (ed. Sharon Lloyd), Cambridge University Press, 2014.

*Pragmatic Rationality and Risk,* Ethics June issue, 2013, Symposium in Honor of the 25th Anniversary of David Gauthier, Morals By Agreement.

*Roundtable Discussion Transcript: The Legal and Ethical Limits of Technological Warfare Symposium, February 1, 2013, University of Utah, S.J. Quinney College of Law,* 2013 Utah L. Rev. 1321 (with Amos N. Guiora, Harry Soyster, David R. Irvine, Geoffrey S. Corn, James Jay Carafano, Laurie R. Blank, Monica Hakimi, George R. Lucas, Trevor W. Morrison, and Frederic Megret).

*Contractarianism,* Chapter 27, in Routledge Companion to Social and Political Philosophy, eds. Fred D'Agostino and Gerry Gaus, Routledge Press, 2012

*Targeted Killing as Preemptive Action,* in Targeted Killing: Law and Morality in an Asymmetrical World, eds. Claire Finkelstein, Jens Ohlin, and Andrew Altman, Oxford University Press, 2012.

*Punishment as Contract,* 8 Ohio J. Crim. Law 319 (2011), Symposium on Criminal Law and Political Philosophy, guest ed. Mary Siegler.

*Vindicating the Rule of Law: Prosecuting Free Riders on Human Rights* in Prosecuting Bush, Cheney and Rumsfeld (eds. Sarat and Hussein), NYU Press, 2010.

*Should Bush Administration Lawyers Be Prosecuted for Authorizing Torture?* (with Michael Lewis) 158 U. Pa. L. Rev. PENNumbra 195 (2010).

*Contrived Defenses and Deterrent Threats: Two Facets of One Problem* (co-authored with Leo Katz), 5 Ohio. J. Crim. Law. 479, Spring, 2008.

*Acting on an Intention,* in Reason, Intention and Morality (eds. Gijs Van Donselaar and Bruno Verbeek), Ashgate Publishing, 2008.

*Two Models of Murder: Patterns of Criminalization in the United States*

4

D0000111

DX0087-004

in HOMICIDE LAW IN COMPARATIVE PERSPECTIVE (eds. Jeremy Horder and David Hughes), Hart Publishing Co., 2007.

*A Contractarian Argument Against the Death Penalty*, 81 N.Y.U. L. REV. 1283 (October 2006).

*Hobbes and the Internal Point of View* 75 FORD. L. REV. 1211 (2006).

*Merger and Felony Murder*, in DEFINING CRIMES: ESSAYS ON THE CRIMINAL LAW'S SPECIAL PART, eds. Anthony Duff and Stuart Green (Oxford University Press, in press and forthcoming 2005).

*Responsibility for Unintended Consequences*, 2 OHIO STATE J. CRIM. LAW 579 (Spring, 2005).

French translation: *Une Approche Contractualiste du Châtiment,* forthcoming in 2006 in volume on punishment published by Editions Liber, eds. Marion Vacheret and Christian Nadeau.

*A Contractarian Approach to Punishment*, THE BLACKWELL GUIDE TO THE PHILOSOPHY OF LAW AND LEGAL THEORY (eds. William Edmundson & Martin Golding, 2004).

*Legal Theory and the Rational Actor*, IN OXFORD HANDBOOK OF RATIONALITY (ed. Al Mele), Oxford University Press (2003).

*Is Risk a Harm?*, 151 U. PA. L. REV. 963 (2003).

*Excuses and Dispositions in Criminal Law*, 6 BUFF. CRIM. L. REV. 317 (2002).

*Death and Retribution*, 21 CRIMINAL JUSTICE ETHICS 12 (Summer/Fall 2002).

*Crime: Definition*, in ENCYCLOPEDIA OF CRIME AND JUSTICE (Macmillan Reference Series, 2002).

*Involuntary Crimes, Voluntarily Committed* in CRIMINAL LAW THEORY: DOCTRINES OF THE GENERAL PART (eds. Stephen Shute and A.P. Simester), Oxford University Press (2002).

*A Puzzle About Hobbes on Self-Defense*, 82 PACIFIC PHIL. Q. 332 (2001).

*Two Men on a Plank,* 7 LEGAL THEORY 279 (2001).

*Rational Temptation* in PRACTICAL RATIONALITY AND PREFERENCE: ESSAYS FOR DAVID GAUTHIER (eds. Christopher W. Morris & Arthur Ripstein), Oxford University Press (2001).

*The Inefficiency of Mens Rea*, in THE MORALITY OF CRIMINAL LAW:

D0000112

DX0087-005

SYMPOSIUM IN HONOR OF SANFORD KADISH, 88 CALIF. L. REV. 895 (2000).

*Positivism and the Notion of an Offense*, 88 CALIF. L. REV. 335 (2000).

*Threats and Pre-emptive Practices*, 5 LEGAL THEORY 311 (1999).

*On the Obligation of the State to Extend a Right of Self-Defense to its Citizens*, 147 UNIV. PENN. L. REV. 1361 (1999).

*When the Rule Swallows the Exception*, in RULES AND REASONING: ESSAYS IN HONOUR OF FREDERICK SCHAUER (Hart Publishing Company, 1999) (reprinted in 19 QUINN. L. REV. 505 (2000).

*Self-Defense as a Rational Excuse* 57 UNIV. PITT. L. REV. 621 (1996).

*Changing Notions of State Agency in International Law: The Case of Paul Touvier*, 30 TEX. INT'L L. J. 261 (1995).

*Duress: A Philosophical Account of the Defense in Law*, 37 ARIZ. L. REV. 251 (1995).

*Note: Financial Distress as a Non-Cooperative Game: A Proposal for Overcoming Obstacles to Private Workouts*, 102 YALE L. J. 2205 (1993).

*Tort Law as a Comparative Institution: A Reply to Perry*, 15 HARV. J. LAW & PUB. POL'Y 939 (1992).


## SHORT ESSAYS, INTRODUCTIONS AND BOOK REVIEWS

*Introduction*, HOBBES ON LAW (Ashgate Publishing, 2005).

*What Personal Rules Can Teach Us About Basic Institutions*, 42 U. San. Diego L.Rev. 69 (2005).

*Preferences and Rational Choice: Introduction*, 151 U. PA. L. REV. 707 (2003).

*Comment on Gerald Postema*, in PROCEEDINGS OF SOFIA CONFERENCE ON PHILOSOPHY OF LAW AND OF POLITICS (Rodolfi Publishers, 2002).

*Introduction to the Symposium on Conflicts of Rights*, 7 LEGAL THEORY 235 (2001).

*No Harm No Foul? Objectivism and the Law of Attempts.* Review of R.A. Duff, CRIMINAL ATTEMPTS, 18 LAW & PHILOSOPHY 69 (1999).

*Mens Rea and Other Criminal Inefficiencies: Review of Leo Katz,* ILL-GOTTEN GAINS, 8 CRIM. L. FOR. 143 (1997).

6

D0000113

DX0087-006

*Legal Justification as a Political Principle*, Proceedings of the 19th International Wittgenstein Symposium, Kirchberg am Wechsel (Spring issue, 1996).

*The Irrelevance of the Intended to Prima Facie Culpability: Reply to Moore*, 76 B.U. L.REV. 335 (1996).

## WORKING PAPERS

*Contemporary Armed Conflict and the Non-State Actor*, Manuscript on file with author

*The Equality of Lives in War*, Manuscript on file with author

*Reason and Morals in Hostage Negotiations*, Manuscript on file with author

*Autonomous Moral Reasoning*, Manuscript, on file with author

*Moral Reasoning and the Death Penalty*, Manuscript on file with Author.

*On the Very Idea of Secret Laws: Transparency, National Security and the Rule of Law*, Manuscript on file with author.

*Contracts Under Coercion: Should You Keep an Agreement with A Robber?*, Manuscript on file with author.

*Rational Contractarianism and International Law*, Manuscript on file with author.

*Hobbes on Contract*, Manuscript on file with author.

ETHICS AND THE INTENTIONAL (dissertation for Ph.d in philosophy, not for publication in current form).

## MAJOR LECTURES AND SIGNIFICANT PUBLIC APPEARANCES

Office of Affirmative Action Diversity Lecture Series, University of Pennsylvania, *Moral Injury, Betrayal, and the Ethics of Public Leaders,* November 17, 2016.

Moderated Conversation with Mr. Sergio Moro on Ethical Leadership, University of Pennsylvania Law School, September 15, 2016

Moderated Conversation with Ambassador Dennis Ross, National Constitution Center, April 15, 2016

D0000114

DX0087-007

Moderated Conversation on *Negotiating Hostage Situations,* with Ambassador Daniel Kurtzer, Ambassador John Limbert, and Mr. Adam Dolnik, University of Pennsylvania Law School, April 14, 2016

Union College: Endowed lecture at Union College on Secrecy, *Targeted Killing and the Rule of Law.* Schenectady, NY, February 2014.

National Constitution Center, Invited Speaker on *Drones: Targeting and Surveillance,* Moderated by Jeffrey Rosen. Philadelphia, PA, September, 2013.

## MEDIA APPEARANCES

SiriusXM station 111, Knowledge@Wharton, Veterans, PTSD, and the Opioid Addiction Crisis (with Dr. Steve Xenakis), October 14, 2016

Sirius XM station 111, Knowledge@Wharton, The JASTA Bill (with Prof. Steve Vladeck), September 30, 2016

Sirius XM station 111, Knowledge@Wharton, The Use of Robotics By the Dallas Police, July 12, 2016

Sirius XM station 111, Knowledge@Wharton, the Justice Against Sponsors of Terrorism Act (with Profs. Robert Vitalis and Karen Young), May 24, 2016

*Debating Drones,* on **Radio Times with Marty Moss-Coane**, debate with Michael Lewis, WHYY Public Radio. March 5, 2013, Audio file at http://whyy.org/cms/radiotimes/2014/03/05/27255/

Radio Appearance discussing *Interpreting the Authorization for the Use of Military Force (AUMF),* Voice of Russia, Host Carmen Russell-Sluchansky. May 24, 2013, Audio File at http://us.sputniknews.com/voiceofrussia/radio_broadcast/58461461/114216133/ .

Wall Street Journal Live, Wall Street Journal Internet Edition, Interview on Release of Government White Paper on *Targeted Killing of American Members of al-Qaeda or Associated Forces,* February 5, 2013.

**Legal Commentator on KPIX Evening News**, discussing possible use of excessive force by Oakland police officers, October 1997.

**Guest on KQED *The Forum***, discussion on the Michael Lantier case and the line between self-defense and vigilante justice, May 1997.

## FACULTY WORKSHOP & CONFERENCE PRESENTATIONS

Fordham University, Fordham Law School Seminar Series on Advanced

8

Criminal Law and Criminal Procedure, Paper Presented: Contemporary Armed Conflict and the Non-State Actor, November 15, 2016

University of Toronto, Legal Theory Workshop, Toronto, Canada, Paper Presented: *Contemporary Armed Conflict and the Non-State Actor*, September 9, 2016.

McGill University, Legal Theory Workshop, Montreal, Canada. Paper Presented: *Killing in War and the Moral Equality Thesis*, March 29, 2016

Symposium on The Morality of Aggression, University of Arizona, Tucson, Arizona. Paper Presented: Responsibility of Acts of War and the Morality Equality Thesis, December 7, 2014.

Undergraduate Law Journal Annual Celebration, Invited Speaker on Secrecy, Targeted Killing and the Rule of Law, Wharton, University of Pennsylvania, November, 2014.

Vanderbilt University: Invited lecture at joint law and philosophy colloquium, April 2014, Paper Presented: *Secrecy, Transparency and the Rule of Law*.

American Association for Social Economics: Presentation of paper called *Legal Contractarianism* on panel on law and economics, Philadelphia, March, 2014.

University of Virginia Law School: Legal Theory Workshop, Charlottesville, March 2014.

Conference on Technological Warfare, University of Utah, invited speaker for panel speech and discussion. February 8, 2013.

Ethics Symposium on Rationality and the Law, Georgetown University, April 14-15, 2013. Paper Presented: Contracts Under Coercion: Should You Keep an Agreement With A Robber? Paper presumptively accepted for publication in ETHICS.

Sovereignty and the New Executive Authority, CERL Conference, University of Pennsylvania Law School, April 2013. Organized conference and presented two works in progress: Contractarianism and International Law, and Secrecy, Targeted Killing and Executive Discretion. Moderated two panels.

Invited speaker for Debate on Drone Warfare with Charles Dunlap (retired General and Law Professor), Alexander Hamilton Society, Annenberg Center, April, 2013.National Press Club, Washington D.C. May 16, 2013.

Presenter on panel at Penn Law Alumni Club, Washington D.C., Topic: Targeted Killing and the War on Terror; moderated by Dean Michael Fitts.

Conference on Rationality and the Law, Georgetown University Philosophy

D0000116

DX0087-009

Department, organized by Henry Richardson on behalf of Ethics. April 14-15, 2013. Paper presented: *Contracts Under Coercion: Should You Keep an Agreement with a Robber?*

Applied Ethics Day, West Virginia University, March 7, 2013. Presentation: Secrecy, Targeted Killing and Discretion. Invited speaker for annual endowed lecture organized by philosophy department.

Harvard University, Kennedy School, November 6, 2012. Invited speaker in speaker series organized by Francis Myrna Kamm. Topic of Talk: Secrecy and Executive Authority.

The Logic of Deterrence, CERL Conference, University of Pennsylvania, November, 2012. Organized Conference and moderated panel.

Brown University, Political Theory Project. October, 2012. Paper Presented: Contracts Under Coercion: Should You Keep a Contract with a Robber?

Cyberwar and the Rule of Law, CERL Conference, University of Pennsylvania, October, 2012. Organized and moderated panel on Cyberwar.

University of Minnesota, Faulty Workshop. September 20, 2012. Paper: Contracts Under Coercion: Should You Keep a Contract With a Robber?

UCLA Legal Theory Workshop, November 29, 2012. Paper Presented: Rational Contractarianism and International Law.

Presentation to Skadden, Arps Attorneys on *Targeted Killing.* New York, June 10, 2012.

Analytic Legal Philosopher's Conference, Presenter, Yale Law School, April 20, 2012. Paper Presented: *Should You Keep a Contract with A Robber?*

Presentation to Board of Managers, University of Pennsylvania Law School Alumni Association, University of Pennsylvania Law School, February 23, 2012.

Presentation to the Penn Law Board of Overseers, *Ethical Aspects of Targeted Killing,* Penn Club, New York, February 3, 2012.

Presentation to Penn Inns of Court, *Recent Developments in the Law of Targeted Killing,* University of Pennsylvania Law School, January 10, 2012.

Conference on the *Actio Libera in Causa,* Organizer and moderator, Penn Institute for Law and Philosophy, University of Pennsylvania Law School, December 8-9, 2011.

Panel on Legal Aspects of Targeted Killing, Moderator, Institute for Law and

10

D0000117

DX0087-010

Philosophy, University of Pennsylvania, November 30, 2011.

York University, Symposium on book manuscript, CONTRACTARIAN LEGAL THEORY, for annual meeting of Canadian Reductionist Philosophers (CARP), October 15-16, 2011.

Georgetown Law Center, *A Contractarian Approach to Contract Law*, presented at annual conference on Promise and Contract, September 23-24, 2011.

Penn Faculty Retreat, *A Contractarian Approach to Contract Law,* September 19, 2011.

York University, Department of Philosophy. Rational Choice Contractarianism: Conference in Honor of David Gauthier, May 2 - 5, 2011. Paper Presented: *Constrained Maximization and Risk.*

National Institute of Health: Joint Bioethics Colloquium on Risk, Washington, D.C., March 8, 2011. Organized by Alan Wertheimer. Papers to be presented: *Is Risk a Harm?* and *Constrained Maximization and Risk.*

University of Pennsylvania Law School, Conference on Targeted Killing, organized by the Penn Institute for Law and Philosophy. April 15 – 16, Chestnut Hill Cricket Club. Paper to be presented: *Targeted Killing as Preemptive Action.*

University of Pennsylvania Philosophy Department, Brown Bag Lunch Series, February 9, 2011. Paper to be presented: *Hobbesian Legal Reasoning and the Problem of Wicked Laws.*

Brooklyn Law School, Criminal Law Scholars Workshop, January 26, 2011. Organized by Dan Markel and Michael Cahill. Paper presented: *Punishment As Contract.*

University of Toronto, Joint Law and Philosophy Workshop Series, November 19, 2010. Paper presented: *Hobbesian Legal Reasoning and the Problem of Wicked Laws.*

Telford Taylor Memorial Conference, organized by West Point and Columbia Law School, October 17-18. Paper Presented: *Responsibility for Acts of War and the Equal Morality of Soldiers*

Temple Law School Faculty Workshop Series (October 13) 2010. Paper presented: *Hobbesian Legal Reasoning and the Problem of Wicked Laws.*

University of California at Berkeley, GALA Workshop Series, September, 2010. Paper Presented: Contracts under Coercion.

11

D0000118

DX0087-011

University of Pennsylvania, Foundations of International Law (May 23 – 24). Paper Presented: *Rational Contractarianism and International Law.*

University of Pennsylvania Law School, Hobbes Today Conference (April 30 – March 2, 2009). Paper Presented: *Hobbesian Legal Theory and the Problem of Wicked Laws.*

Hoffinger Colloquium, NYU Law School, (March 23, 2009), New York City. Paper Presented: *Punishment as Contract.*

Penn Law Faculty Ad Hoc Series, (March 4, 2009), Philadelphia, PA. Paper Presented: *Punishment as Contract.*

*Penn Law Annual Faculty Retreat,* (September 22, 2008), Philadelphia, PA. Paper Presented: *Contracts Under Coercion: Should You Keep an Agreement with a Robber?*

Georgetown Law Center, Conference on Contract and Promising (September 19-20), Washington, D.C. Paper Presented: *Hobbes on Contract.*

University of Leipzig, Seminar Series on Theories and Mechanisms of Order, (June 2, 2008), Leipzig, Germany. Paper Presented: *Rational Contractarianism and International Law.*

American Academy, Siemens Lecture, (March 11, 2008), Berlin, Germany. Paper Presented: *Contractarian Legal Theory and Contracts Under Coercion.*

University of Heidelberg, Center for American Studies, Baden-Wurttenberg Faculty Lecture Series, (February 7, 2008). Paper Presented: *Contracts Under Coercion: Should One Keep an Agreement with a Robber?.*

Faculty Lecture Series, Tufts University (December 1, 2007). Paper Presented: *Contracts Under Coercion: Should One Keep a Promise to a Robber?*

Law and Philosophy Workshop, University of Chicago Law School (November 26, 2007). Paper Presented: *Contracts Under Coercion: Should One Keep a Promise to a Robber?*

Conference on Trust, Yale Philosophy Department, (April 20-21, 2007), *Commentator on Cristina Bicchieri.* Paper Presented: *Hobbes' Third Law of Nature as a Trust Game.*

Georgetown Law and Philosophy Seminar (April 9, 2007). Paper Presented: *Actio Libera and Nuclear Deterrence: Two Facets of One Problem.*

Cornell Law School Faculty Workshop Series (September 20, 2006). Paper Presented: *A Contractarian Argument Against the Death Penalty.*

12

D0000119

DX0087-012

Conference on The Boundary of Rights and Responsibilities in Morality and Law, Rutgers' Institute for Law and Philosophy (May 21 – 23, 2006). Paper Presented: *Responsibility and the Doctrine of Double Effect.*

Conference on Morality and Law, William & Mary College of Law, (March 18 – 16, 2006). Paper Presented: *Actio Libera and Nuclear Deterrence: Two Facets of One Problem* (co-authored with Leo Katz). Video of presentation available at http://www.wm.edu/law/ibrl/scholarlysym.shtml#Symposium_on_Law_and_Morality.

Conference on The Internal Point of View in Law and Ethics, Fordham University School of Law, (February 9 – 10, 2006). Paper Presented: *Hobbes and the Internal Point of View.*

Faculty Enrichment Series, Florida State University College of Law (September 29, 2005). Paper Presented: A Philosophical Argument Against the Death Penalty.

UCLA Faculty Workshop in Law and Philosophy, University of California at Los Angeles (February, 2005). Paper presented: *Responsibility for Unintended Consequences.*

Conference on Punishment: Theory and Practice, University of Chicago (November 12 & 13). Paper presented: *A Contractarian Approach to the Death Penalty.*

Conference on Criminal Law and Athe Special Part, Baton Rouge, La. (March, 2004). Paper presented: *Merger and Felony Murder.*

Conference on Punishment, History, Practice and Theory, Université de Montreal. Montreal, Canada (March, 2004). Paper presented: *A Contractarian Approach to Punishment.*

Faculty Workshop Series, Villanova Law School. Villanova, Pennsylvania. (March, 2004). Paper presented: *Legal Theory and the Rational Actor.*

AALS panel on Rule-following in the Law. Atlanta, Georgia (January, 2004). Paper presented: *Rule-Following and its Implications for Law.*

Panel on Criminal Responsibility, 21st World Congress of the International Association for Philosophy of Law and Social Philosophy, Lund, Sweden (August 2003). Paper presented: *Responsibility for Unintended Consequences.*

George Mason, Workshop Series. (April, 2003).
Paper Presented: *Contractarian Legal Theory.*

13

D0000120

DX0087-013

Workshop on Contractarianism and the Law, University of Pennsylvania. (March 2-3, 2003).
Paper presented: *A Contractarian Approach to Punishment.*

Conference on "Reasons, Intentions and Morality," University of Amsterdam, The Netherlands (June 20 - 21, 2002).
Paper Presented: *Intentional Action and the Deliberative Requirement.*

Rutgers University School of Law, Faculty Workshop (April 25, 2002).
Paper Presented: *An A Priori Argument Against the Death Penalty.*

University of Pennsylvania Philosophy Department, (March 8, 2002).
Paper Presented: *Constrained Maximization and Risk.*

University of Pennsylvania Law School (March 1 - 2, 2002), Conference on Rationality and Preferences.
Paper Presented: Comment on paper by Joe Mintoff.

Arizona State University (February 7 - 8, 2002), Conference on Criminal Law and Religion.
Paper Presented: Comment on paper by Antony Duff.

Eastern Division Meeting of the American Philosophical Association, Panel on the Death Penalty (December 28 - 30, 2001).
Paper Presented: *An A Priori Argument Against the Death Penalty.*

University of Pennsylvania Law School, Faculty Retreat (September 14, 2001).
Paper Presented: *An A Priori Argument Against the Death Penalty.*
(Commented on by Stephen Morse).

University of Pennsylvania Law School, Ad Hoc Summer Workshop (June, 2001).
Paper Presented: *Constrained Maximization and Risk.*

Boston University School of Law, Workshop Series (November 30, 2000)
Paper Presented: *Lack of a Voluntary Act.*

Macquarie University, Department of Philosophy, Speaker Series (June 20, 2000).
Paper Presented: *Two Men on a Plank.*

University of Newcastle, Department of Philosophy, Speaker Series (June 1, 2000)
Paper Presented: *Constrained Maximization and Risk*).

Columbia University, Analytic Legal Philosophers Conference (April 7, 2000)
Paper Presented: *A Puzzle About Hobbes on Self-Defense.*

14

D0000121

DX0087-014

University of Pennsylvania Law School, Conference on Michael Moore (March 31, 2000)
Paper Presented: *Lack of a Voluntary Act.*

RSSS, Australian National University, Brown Bag Lunch Series (March 7, 2000).
Paper Presented: *Two Men on a Plank.*

U.C. Santa Barbara, Department of Philosophy (April 11, 1997), Speaker Series.
Paper presented: *On the Obligation of the State to Extend a Right of Self-Defense to its Citizens.*

American Philosophical Association, Eastern Division. Philosophy of Law Panel on Problems of Act Description in the Criminal Law (December, 1996).
Paper presented: *On Doing Something Unintended, Intentionally.*

University of California, Berkeley School of Law. Conference of International Scholars on Law, Risk, and Management. (December 30, 1996).
Paper presented: *The Distinction between Tort and Crime in American Law.*

University of Irvine, Southern California Philosophy Conference Philosophy of Law Panel (October, 1996).
Paper presented: *On Doing Something Unintended, Intentionally.*

19th International Wittgenstein Symposium (August, 1996)
Paper presented: *Justification as a Political Principle.*

George Mason Law School, Workshop Series (October, 1995).
Paper presented: *Counter-preferential Behavior* (revised as *Rational Temptation*).

University of Pittsburgh, Joint Law/Philosophy Conference on *Self-Defense and Relations of Domination* (April, 1995).
Paper presented: *Self-Defense as a Rational Excuse.*

Boston University School of Law, Conference on the Tort/Crime Distinction (March, 1995).
Paper presented: *The Irrelevance of the Intended to Prima Facie Culpability: Response to Moore.*

## LEGAL/MILITARY BRIEFINGS

Briefing to J-5 Middle East Division, Pentagon. Subject: Threat Finance and the Rule of Law, July 10, 2016

Briefing to Senior Army JAGS and invited guests. Subject: The Ethics of Interrogation, July 9, 2016

D0000122

DX0087-015

Special Operations Forces Briefing, Pembroke College, Oxford, England Spring 2016.

COURSES TAUGHT

Contracts (taught regularly, required first year course).

Criminal Law (taught regularly, required first year course).

Evidence (Spring 2014; co-taught Spring 2012).

Introduction to Jurisprudence (taught regularly, first year elective, cross listed with Philosophy in Spring 2011).

Political Philosophy and the Law (Fall, 2010, cross listed with Philosophy).

Jurisprudence of War Crimes (Cross-listed Seminar with Philosophy).

Philosophy of Law (seminar or undergraduate course).

Modern Legal Thought (first year elective).

Advanced Topics in the Philosophy of Law (seminar).

Contractarianism and the Law (seminar).

Rationality and the Law (seminar).

Rationality, Norms and the Law (seminar).

Philosophy of Criminal Law (seminar).

Theory of Rights (seminar).

Action Theory (upper-level undergraduate course)

Introduction to Ethics (undergraduate course)

Political Philosophy (undergraduate course)

MEPI Sessions on Contracts (2 or 3 hour meeting for State Department Program)

Law and Morality of War (seminar)

PROFESSIONAL MEMBERSHIPS AND ACTIVITIES

Institute for Law and Philosophy, Director 2003-05, 2008-09; co-director, 2009-12.

16

D0000123

DX0087-016

Law and Philosophy, Advisory Board

AALS Section on Jurisprudence, Chair 2002-03

American Philosophical Association (APA)
        Committee on Philosophy of Law 1999 - 2002

Association of the Society for Political and Legal Philosophy (ASPLAP)

Reviewer for Oxford University Press

Reviewer for Journal of the History of Philosophy

Reviewer for Law and Philosophy


## AWARDS AND FELLOWSHIPS

| | |
|---|---|
| Spring 2008 | American Academy in Berlin, Siemens Fellow. Berlin Prize Winner |
| Spring 2000 | Australian National University, Harsanyi Fellowship |
| 1998-1999 | University Center for Human Values, Laurance S. Rockefeller Visiting Fellowship, Princeton University |
| Summers 1992-1993 | John M. Olin Summer Fellowship awarded to further dissertation research |
| 1989-1990 | Andrew Mellon Fellowship for first year graduate work, University of Pittsburgh |
| 1987-1988 | Harlan Fiske Stone Scholarship awarded for first year studies, Columbia Law School. |
| 1983-1986 | John Harvard Scholarship, Harvard College |


## OTHER EMPLOYMENT

| | |
|---|---|
| Summer 1989 | **Coudert Brothers**, New York.  Summer Associate |
| Summer 1988 | **International Commission of Jurists**, Geneva, Switzerland.  Summer Intern |

17

D0000124

DX0087-017

Summer 1986        **NAACP Legal Defense Fund**, New York.  Summer Intern

18

D0000125

DX0087-018

# Exhibit J



# WILLIAM F. SHEA, CPA



**Education and Certifications**
* Bachelor's degree in Finance/Accounting, Boston College
* Certified Public Accountant, California
* Certified Global Management Accountant (AICPA)

**Affiliations**
* Member, American Institute of Certified Public Accountants

**William F. Shea** is a Partner at Floyd Advisory. He has an extensive range of experience covering accounting, advisory and investigation services, including post-acquisition and earn-out disputes, royalty audits and other specially-prepared calculation disputes, restatements, forensic accounting, valuation assignments, and special investigations. Mr. Shea also has worked on corporate monitorship engagement teams, focusing on compliance and internal control structures in the aftermath of disruptive events.

He has worked with clients in various industries, including financial services, real estate, retail and consumer goods, pharmaceuticals, healthcare, construction, government and not-for-profits. He has experience working with major law firms, private equity firms, government agencies and executive management. Mr. Shea has testified in trial court on prepared models and calculations, and also testified in front of a FINRA Dispute Resolution Arbitration Panel on damages.

Prior to joining Floyd Advisory, Mr. Shea worked at FTI Consulting in their Forensic and Litigation Consulting Practice. He had previously worked within Huron Consulting Group's Accounting and Financial Consulting Practice. Prior to beginning his career, Mr. Shea graduated Cum Laude from the Honors Program at Boston College.

Examples of Mr. Shea's professional experiences include:

* Assisted private equity firms in pre-deal risk assessment and mitigation procedures ahead of the sale of portfolio companies, surrounding the calculation of working capital and the structure of the purchase-and-sale agreement(s).
* Worked with private equity buyers in preparing working capital adjustment claims by analyzing the closing accounting packages and relevant deal language. In some cases, assisted with the preparation of related arbitration or other dispute resolution submissions.

**DEFENSE EXHIBIT**
USA v. DEVOS LTD. et al.
DX0088

dodpdp    PID:6oKIPIKrt

D0000126

DX0088-001

* Performed an accounting review, including considerations related to multiple levels of LLC agreements, for a real estate investment firm under SEC inquiry. Work also included creating hearing exhibits for the presentation to SEC.

* Prepared and testified to a financial model related to amounts due lender on a commercial promissory note for a property which lender had foreclosed on and borrower counter-sued.

* Prepared a valuation model and provided additional insights for the board of directors of a large PPO in advance of an equity investment into a specialty PPO start-up.

* Prepared a damages model related to lost portfolio profits for a wrongfully terminated fund manager. Testified on behalf of model in front of FINRA arbitration panel.

* Appraised the value of a technology start-up in the mobile commerce industry in support of negotiations related to the exercise of a former executive's put option to sell shares back to the company.

* Led a forensic expense review audit in a department of a large reinsurance organization, focusing on evaluating the control failures and circumventions that existed to allow for the actions of an individual under investigation. Reported to the general counsel and audit committee of the entity, and advised the internal audit team on recommendations for further enterprise-wide reviews.

* Engaged as the financial and forensic accounting consultant to the engaged integrity monitor, on behalf of NYC Dept. of Investigations for a large not-for-profit organization accused of having former CEO embezzle millions of public monies related to an insurance scheme.

* Investigated claims of financial reporting fraud in a newly-acquired portfolio company and reported to a special committee including the private equity partners and CEO/CFO of new company. Prepared a brief in support of claims of working capital adjustment and breaches of reps and warranties.

## Testimony

### Trial and Deposition Testimony

* 5-9 Woodland LLC v. 5/9 Woodland, LLC, Connecticut Superior Court, Judicial District of Stamford/Norwalk, Financial Model and Damages (April 2016)

* FINRA Dispute Resolution Arbitration Number 10-02178; John Peter Freund vs. Morgan Stanley Smith Barney, Morgan Stanley DW Inc., Morgan Stanley Smith Barney Holdings, LLC et al, Damages Analysis and Calculation related to Lost Profits (May 2013)

D0000127

DX0088-002

**Exhibit K**




# Louis Cinquanto, EnCE, ACE

**Professional Experience**

**Cornerstone Legal Consultants, Philadelphia, Pennsylvania**
*Senior Digital Forensic Examiner, Managing Director*
*Admitted Expert, United States Federal Courts (PA, NJ, KY) and State Courts (PA, DE)*
November 2004 – Present
Certified digital forensic examiner responsible for collecting, preserving, and examining electronic discovery in both civil and criminal matters both nationally and internationally. Admitted as an expert in United States Federal Court. Provide e-discovery consultation to Federal courts, Federal agencies and the privates sector, including Fortune 500 companies. Participated in the examination of hundreds of electronic storage devices including: computer and server hard drives, cell phones, cell phone records, thumb drives, iPods and cameras. Created EnCase, Summation and Trial Director training curriculum for company employees. Design and administer e-discovery review databases.

**Buchanan Ingersoll and Rooney, PC, Philadelphia, Pennsylvania**
*National Litigation Support Manager*
February 2007 – February 2008
Duties included the intake and processing of electronic discovery for all national offices. Worked directly with attorneys to author requests for discovery, meet and confer consultations, e-discovery vendor selection and trial presentation. Presented CLE courses internally on e- discovery matters involving the collection and presentation of evidence at trial. Responsible for creating review databases and trial databases. Presented trial evidence in both state and federal courts. Trained attorneys and legal staff in the use of review databases and trial presentation software nationally.

**United States Air Force (Captain), McGuire Air Force Base, NJ**
*Pilot, KC-10 Mission Commander, Local Area Network Manager*
May 1997 - November 2005
**Security Clearance Held: Secret**
Responsibilities included the handling and storage of classified information for multiple Air Force operations including: Operation Iraqi Freedom, Operation Enduring Freedom and Operation Southern Watch. Responsible for aircrew training and briefing prior to deployment. Responsible for Local Area Network management for 300 end-users. Implemented and monitored computer security policy. Investigated internal network security breaches and provided briefing to commanders. Designed and implemented web-based database for Air Force Reserve member access. This database earned Benchmark status and became the framework for "Reservenet", the primary Air Force Reserve information portal.

**4775 League Island Boulevard | Philadelphia, PA 19112**
**(P) 267.639.6900 | www.cornerstonediscovery.com**


docfol.io
**DEFENSE EXHIBIT**
USA v. DEVOS LTD. et al.
DX0935
PID:6oKlPLru

DX0935-001





## Education and Training

**Certified Digital Forensic Examiner, A.C.E.**
The AccessData Certified Examiner (ACE) program certifies both public and private sector professionals in the use of AccessData's forensic examination software platform, the Forensic Tool Kit, or FTK. This certification acknowledges that I have mastered computer investigation methodology as well as the use of FTK during complex computer examinations. Recognized by both the law enforcement and corporate communities as a symbol of in-depth digital forensics knowledge, ACE certification illustrates that an investigator is a skilled computer examiner. Demonstrated proficiency in both practical and written examinations.

**Certified Digital Forensic Examiner, EnCE**
The EnCase Certified Examiner (EnCE) program certifies both public and private sector professionals in the use of Guidance Software's EnCase computer forensic software. EnCE certification acknowledges that I have mastered computer investigation methodology as well as the use of EnCase during complex computer examinations. Recognized by both the law enforcement and corporate communities as a symbol of in-depth digital forensics knowledge, EnCE certification illustrates that an investigator is a skilled computer examiner.

**EnCase Computer Forensics I**
Trained in the proper handling of digital evidence from the initial seizure of the computer/media to hard drive or other media acquisition; the analysis of data; archiving and validating data.

**EnCase Computer Forensics II**
Trained in the location and recovery of deleted files; advanced searches using GREP; the EnCase Virtual File System (VFS), Physical Disk Emulator (PDE) and Windows® Registry; the handling of compound file types; exporting files, directories and entire volumes; the identification of files using hash values and building hash libraries; the identification of Windows XP operating system artifacts such as link files, recycle bin, and user folders; the preparation of reports and evidence for presentation in court; the recovery of artifacts such as swap files, file slack, and spooler files; the recovery of printed and faxed pages.

**Advanced Internet and Email Investigations**
Trained in the recovery and examination of e-mail messages, headers, and attachments from widely used e-mail applications (Outlook®, America Online®, and Netscape®) and web-based email providers; locating and examining artifacts from search engines, instant messaging clients, and newsgroups.

**The Computer Enterprise and Investigations Conference, CEIC 2012 Courses Taken:**
•Tracks Left by Covering Your Tracks
  •Cloud-Based ECA and Review for Production
  •Forensic Tracking of USB Devices
  •Using Cloud Computing in Computer Forensics and Electronic Discovery
  •EnCase v7
  •What's New in Windows Forensics
  •iOS Forensics - A Comprehensive Approach (Mobile Phones and Tablets)
  •GPS Devices- Tracking, plotting and deciphering GPS and cellphone coordinate data. (Included Practical mapping results in Google Earth)
  •Art Form of Creating Keywords and ECA Review

DX0935-002




**Local Area Network (LAN) Manager Training**
Instructed in the Department of Defense's policy in maintaining network integrity both locally and globally; auditing network policy and security; performing investigations of security infractions on local machines; handling of electronically stored information and chain-of custody.

**Academy of Military Science**
Commissioned in the United States Air Force; Distinguished Graduate Award

**Embry-Riddle Aeronautical University, Daytona Beach, FL**
B.S. Aeronautical Science; Special Focus: Ada Computer Programming Language

## Lectures, Commentary, Court Appointments

*Presenter, Examining Cell Phone Evidence and Other Technology Discovery Issues,* New York State Association of Criminal Defense Lawyers (NYSACDL) CLE Seminar, Federal Practice, 2016

*Presenter*, Digital Evidence and e-Discovery in Criminal Cases, 32nd Annual Criminal Law Symposium, Pennsylvania Bar Institute, 2015

*\*Appointed Electronic Discovery and Computer Forensic Expert to the Court -* Expert to the Honorable L. Felipe Restrepo, Eastern District of Pennsylvania, Rule 706(a), Under the Federal Rules of Evidence, April 2015

*Presenter, Electronic Presentation of Evidence – What Worked In Recent Acquittals In U.S. v Scarfo -* The American Bar Association, 2014

*Presenter, Preservation & Collection Strategies, Computer Forensics for the Litigator, Strategies for Efficiently Dealing with Digital Evidence* – Pennsylvania Bar Institute, 2014

*Presenter, Uncovering Digital Evidence, Mobile Forensics* – Pennsylvania Bar Institute, 2014

DX0935-003




*Presenter/Lecturer,* Widener Law School, Mobile Forensics and E-Discovery, 2014

*Presenter, Trial Technology,* University of Pennsylvania Law School, 2014

*Adjunct Professor, Trial Technology,* Temple University Beasley School of Law, 2014

*Spoliation and Preservation of Evidence in Civil Cases and Digital Preservation of Electronic Evidence and Working with Experts* - Pennsylvania Bar Institute, November 2013

*\*Appointed Electronic Discovery Expert to the Court* - Expert to the Honorable Timothy Rice, Eastern District of Pennsylvania, June 2013

*\*Appointed Electronic Discovery Expert to the Court* - Expert to the Honorable Michael Baylson, Eastern District of Pennsylvania, Rule 706, Under the Federal Rules of Evidence, May 2013

*Presenter, Discovery Protocol Regarding Electronically Stored Information (ESI): What you can expect to receive from the government, and how it can be accessed and processed* - Federal Public Defenders Office in conjunction with The Association of Criminal Defense Lawyers of New Jersey and the Association of The Federal Bar of New Jersey, 2013 CJA Seminar

*Presenter, Mobile Forensics and Cell Phone Record Interpretation* - Criminal Law Symposium, Pennsylvania Bar Institute, 2013

*Presenter, Trial Technology* - University of Pennsylvania Law School, 2013

*Adjunct Professor, Trial Technology,* - Temple University Beasley School of Law, 2013

*eDiscovery, Computer Forensics and the Cloud* - Pennsylvania Bar Institute, 2013

*Cybercrime: Handling the Computer Intrusion Case,* - Pennsylvania Bar Institute, 2012

*Cell Phone Forensics, What every attorney should know about recovering digital evidence* - Pennsylvania Bar Institute, 2012

*Presenter/Lecturer,* Widener Law School, E-Discovery, 2012

*Adjunct Professor,* Temple University Beasley School of Law, E-Discovery, Trial Technology, 2012

*Presenter, Logistics of Litigation Technology, Criminal Justice Act Conference* - Adjunct Professor, Temple University Beasley School of Law, 2010

*Presenter, Trial and Discovery Issues Associated with Social Networking Sites, Rules and Procedure Committee,* - Philadelphia Bar Association, April 2010

DX0935-004




*Presenter, Discovery Management and Trial Presentation* - Federal Public Defender Office in Conjunction with the Association of the Federal Bar of New Jersey, January 2010

*Presenter, E-Discovery: An Introduction* - National Insurance Institute, December 2009

*Presenter,* Evidence Presentation in the 21st Century – Evidence Presentation with Computerized Applications - United States District Court, Middle District of Pennsylvania, August 2009

*Panel Member* - Third Circuit Courtroom Technology Panel, May 2009

*Presenter, Electronic Discovery – An Overview* - Temple University, Beasley School of Law, March 2009

*Member*, Third Circuit Court of Appeals Technology Committee, September 2008

*Commentator*, *"Extent of Mendte's Snooping"*, The Philadelphia Inquirer, July 2008

*Panel Member*, Second, Third and Fourth Circuit Judicial Education Conference on Technology, Philadelphia, Pennsylvania, May 2008

*E-Discovery, A Practical Approach*, National Insurance Institute, April 2008

*The Nuts and Bolts of Technology in the Courtroom* - Pennsylvania Association of Criminal Defense Lawyers, April 2007

*Presenter, Complex Cases involving e-Discovery*, CJA Conference, 2005, 2006, 2007


## Testimony and Qualification as an Expert

Commonwealth of Pennsylvania v. Tam Le, CP-51-CR-0002231-201, Court of Common Pleas, Philadelphia County


United States v. Ramsey, 2:14-cr-00296-JFL, United States Eastern District of Pennsylvania

United States of America v. Chaka Fattah, et al. 2:15-cr-00346-HB, United States Eastern District of Pennsylvania

United States of America v. James Walker, 1:13-cr-00064-RGA, United States, District of Delaware

Commonwealth of Pennsylvania v. Dominic Diaz, NO. 3451 -2014, Court of Common Pleas, Erie County, Pennsylvania

DX0935-005




Black Diamond Mining Company, LLC, et al. v. Ira J. Genser, Larry Tate, And Alvarez & Marsal North America, LLC Civil No. 7:13-cv-125-ART, Eastern District of Kentucky

Commonwealth of Pennsylvania v. Abdullah Muhammad, CP-51-CR-0005853-2012, First Judicial District of Pennsylvania, Criminal Justice Center, Philadelphia, Pennsylvania

Meyer-Chatfield Corp v. Bank Financial Services Group, et al., Civil Action No. 2013-29858, Montgomery County, PA, Court of Common Pleas

Wayman Fire Protection, Inc. v. Premium Fire & Security, LLC, No. 7866-VCP, Delaware State Court

United States of America v. Dorothy June Brown, et al., 12-0367, United States Eastern District of Pennsylvania

Malibu Media, LLC, v. John Does 1, 6, 13, 14, and 16, Civil Action No. 12-2078

United States of America v. George Holley, 11-066 (JAP) – United States, District of New Jersey – (Testifying expert on behalf of the United States of America)

United States of America v. Scarfo, et al. (RBK) – United States, District of New Jersey

Commonwealth of Pennsylvania v. Colin Abbott, Criminal Division CP-10-CR-0001863- 21011, District Attorney's Office, Butler County, Pennsylvania, Admitted Expert without Opposition (Investigation and authored report on behalf of Commonwealth of Pennsylvania)

## Honors

Benchmark Status in Computer Database/Web Application Design, United States Air Force 2004

Officer of the Quarter, McGuire Air Force Base, United States Air Force, 2004

Air Force Achievement Medal, 2004

Distinguished Graduate and Commencement Speaker, USAF Officer Commissioning, Academy of Military Science, 1997

DX0935-006

# Exhibit L

# MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

ELKAN ABRAMOWITZ
RICHARD F. ALBERT
ROBERT J. ANELLO*
LAWRENCE S. BADER
BENJAMIN S. FISCHER
CATHERINE M. FOTI
PAUL R. GRAND
LAWRENCE IASON
BRIAN A. JACOBS
JUDITH L. MOGUL
JODI MISHER PEIKIN
ROBERT M. RADICK*
JONATHAN S. SACK**
EDWARD M. SPIRO
JEREMY H. TEMKIN
RICHARD D. WEINBERG

565 FIFTH AVENUE
NEW YORK, NEW YORK 10017
(212) 856-9600
FAX: (212) 856-9494

www.maglaw.com

WRITER'S CONTACT INFORMATION

(212) 880-9558
rradick@maglaw.com

COUNSEL
JASMINE JUTEAU

ROBERT G. MORVILLO
1938-2011
MICHAEL C. SILBERBERG
1940-2002
JOHN J. TIGUE, JR.
1939-2009

*ALSO ADMITTED IN WASHINGTON, D.C.
**ALSO ADMITTED IN CONNECTICUT

January 16, 2017

**By Email**

Nancy Rue, Esq.
Patrick Murray, Esq.
Assistant U.S. Attorneys
United States Attorney's Office for the Eastern
   District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

> Re:   *United States v. Devos Ltd., d/b/a Guaranteed Returns, Dean Volkes,*
>       *Donna Fallon, and Ronald Carlino*, Crim. No. 14-574

Dear Ms. Rue and Mr. Murray:

On behalf of Devos Ltd., d/b/a Guaranteed Returns, Dean Volkes, and Donna Fallon (collectively, the "defendants"), we write pursuant to the Court's January 5, 2017 Order (the "January 5 Order") directing the parties to exchange witness lists, exhibit lists, and expert disclosures on or before Monday, January 16, 2017. This letter addresses each of the three disclosures required pursuant to the January 5 Order.

**Witnesses**. The defendants have not yet determined whether they will call any witnesses in their respective defense cases, and for this reason cannot provide a witness list at this time. The defendants reserve the right to present testimony from fact and expert witnesses based on the government's case and developments at trial, including but not limited to the expert witnesses listed below.

**Exhibits**. A defense exhibit list accompanies this letter, and the exhibits themselves will be sent to you by email. To the extent any documents listed on the defense exhibit list are not yet in the possession of the government, this disclosure is made pursuant to the defendants' obligation to provide discovery pursuant to Rule 16(b)(1)(A) of the Federal Rules of Criminal Procedure. The defendants reserve the right to supplement their exhibit list and to make further disclosures pursuant to Rule 16(b)(1)(A) at any time before or during trial.

**Experts**. Pursuant to Rule 16(b)(1)(C) of the Federal Rules of Criminal Procedure, the defendants provide notice that, should there be a defense case, they may call the below-listed

Nancy Rue, Esq.
Patrick Murray, Esq.
Assistant U.S. Attorneys
January 16, 2017
Page 2

expert witnesses. Defendants reserve the right to amend or supplement the summaries of such
testimony as set forth below, and to designate additional expert witnesses as necessary.

## Brian Berntson

1) Qualifications. Brian Berntson worked for twenty-two years as a Special Agent with the
   Internal Revenue Service Criminal Investigation Division ("IRS-CI") from 1991 until his
   retirement in 2013. Mr. Berntson personally conducted more than fifty complex money
   laundering investigations involving a wide range of specified unlawful activities,
   including mail and wire fraud, theft of government property, drug trafficking, social
   security fraud, theft of bank funds, illegal gambling, alien harboring, bank fraud, bribery,
   major fraud against the government, procurement fraud, and public corruption. During
   his tenure at IRS-CI, Mr. Berntson testified numerous times as a case agent in both tax
   and money laundering cases, and was qualified as a money laundering expert witness and
   provided expert testimony on seven separate occasions in various district courts. Mr.
   Berntson was a member of the IRS-CI money laundering expert witness cadre for twelve
   years, from October 2001 until his retirement in 2013, and assisted in the training of
   money laundering expert witness cadre members. Mr. Berntson also provided money
   laundering, Bank Secrecy Act, and financial investigative techniques training to
   numerous federal and state agencies during his career at IRS-CI.

   After retiring from the IRS in 2013, Mr. Berntson founded Money Laundering
   Consultants, a firm that offers a range of financial investigative and training services
   relating to the Bank Secrecy Act, USA Patriot Act, and anti-money laundering efforts.

   Mr. Berntson earned a B.A. in Sociology with an emphasis in Law and Criminology from
   the University of Minnesota. During his tenure at IRS-CI he received advanced money
   laundering training and attended annual money laundering conferences. He is a Certified
   Anti-Money Laundering Specialist.

2) Summary of Anticipated Testimony. It is anticipated that Mr. Berntson would, if called
   as a witness, offer testimony regarding the steps commonly involved in money
   laundering, as well as the ways in which individuals and organizations may launder or
   attempt to launder money.

## Harris Devor

1) Qualifications. Harris Devor is a partner at Friedman LLP and has more than forty-two
   years of experience in applying generally accepted accounting principles ("GAAP"),
   generally accepted auditing standards ("GAAS"), and SEC requirements. He is

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

Nancy Rue, Esq.
Patrick Murray, Esq.
Assistant U.S. Attorneys
January 16, 2017
Page 3

nationally recognized as a forensic and litigation support practitioner, having testified in some of the most high-profile securities fraud cases of the last twenty years. He also practices as an audit partner, leading audit engagements in a multitude of industries, including public companies, closely held business, and not-for profits.

In 1978, Mr. Devor founded Shechtman Marks Devor PC. There, he spent nearly forty years providing specialty audit and assurance, tax planning and forensic, litigation, and valuation services to a wide variety of industries including manufacturing, distribution, not-for-profit, professional services, construction, metals, and healthcare. In January, 2016 Mr. Devor became a partner at Friedman LLP when it merged with Shechtman Marks Devor PC.

Mr. Devor has also taught and lectured on numerous topics ranging from securities law violations to accounting and auditing related subjects. Mr. Devor is affiliated with several professional accounting organizations, including the American Institute of Certified Public Accountants and the Pennsylvania Institute of Certified Public Accountants.

Mr. Devor is a Certified Public Accountant and received his B.B.A in Accounting from Temple University.

2) Summary of Anticipated Testimony. It is anticipated that Mr. Devor would, if called as a witness, testify regarding his analysis of Guaranteed Returns' banking relationships and financial records. He is expected to opine upon whether the bank accounts held by Guaranteed Returns and the financial transactions by which funds were deposited into and transferred out of Guaranteed Returns' bank accounts were typical of closely-held corporations. He is further expected to opine upon whether the transactions were transparent, whether the transactions were consistent with legitimate business practices, and whether any aspect of the transactions made it more difficult to identify the funds in the relevant accounts.

## Professor Claire Finkelstein

1) Qualifications. Professor Claire Finkelstein is an expert in, among other topics, contract law, criminal law theory, and the rule of law. She serves as the Algernon Biddle Professor of Law and Professor of Philosophy at the University of Pennsylvania Law School, where she has worked since July 2000. She has published extensively in the areas of criminal law, contracts, jurisprudence, rational choice theory, and the law and ethics of war.

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

Nancy Rue, Esq.
Patrick Murray, Esq.
Assistant U.S. Attorneys
January 16, 2017
Page 4

In 2012, Professor Finkelstein founded the University of Pennsylvania Law School's Center for Ethics and the Rule of the Law, a non-partisan organization devoted to promoting rule of law values in the context of national security. She has served as the center's Director since its inception. Professor Finkelstein has also served as a Co-Director of the University of Pennsylvania Law School's Institute for Law and Philosophy.

Before joining the faculty of the University of Pennsylvania Law School in 2000, Professor Finkelstein worked for six years as a professor of law at the University of California, Berkeley. She holds a B.A. in Philosophy and Government from Harvard College, a J.D. from Yale Law School, a Ph.D. in Philosophy from the University of Pittsburgh, and a Master's degree from the University of Paris, Sorbonne.

2) Summary of Anticipated Testimony. It is anticipated that Professor Finkelstein would, if called as a witness, testify regarding principles of contract law; the terms of Guaranteed Returns' contractual and business relationships with customers and other individuals and entities; the relationship between oral and written promotional materials on the one hand and actual written contracts on the other; and the intersection between, among other things, the company's handling of indated and other pharmaceutical products, the provisions of the company's contractual agreements, and the legal principles relevant to each of the foregoing.

## Dr. Sophia Pasedis

1) Qualifications. Dr. Pasedis has over twenty-five years of experience in the field of pharmacy/health care management, during which she has witnessed the development and evolution of the reverse distribution pharmaceutical industry while working directly with numerous reverse distribution companies.

Her practice includes pharmacy system improvements; federal and state regulations pertaining to pharmacy, drug procurement, and distribution systems; vendor relationships and contracting; and pharmacy standards of practice.

Dr. Pasedis served two consecutive terms on the Massachusetts Board of Registration in Pharmacy and also served on the Massachusetts Board of Medicine Patient Care Assessment Committee for three terms. Dr. Pasedis was registered in 44 states and is well versed in addressing a variety of pharmacy issues including: pharmacy compliance and standards of practice, medication dosing and indications, drug procurement and dispensing procedures, drug distribution, labeling, compounding stability, controlled substance diversion, and pharmacy practice standards.

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

Nancy Rue, Esq.
Patrick Murray, Esq.
Assistant U.S. Attorneys
January 16, 2017
Page 5

Dr. Pasedis was the Vice President of a large sterile admixing facility, has worked as a retail and hospital pharmacy director at various Boston teaching hospitals, and served as Associate Professor of Clinical Pharmacy Practice at Northeastern School of Pharmacy and Massachusetts College of Pharmacy. She is a speaker for national and state organizations.

2) <u>Summary of Anticipated Testimony</u>. It is anticipated that Dr. Pasedis would, if called as a witness, testify based on her industry experience and understanding of industry norms and practices concerning: (a) the evolution of the reverse distribution industry for pharmaceuticals, including the need for such services before reverse distribution companies became common in the pharmaceutical space and the value provided by such companies, and (b) the evolution in the treatment of indated products by reverse distribution companies and their customers.

## Raymond Scheel

1) <u>Qualifications</u>. Ray Scheel has over twenty years of experience in the fields of software development and computer programming, and has worked extensively with filePro throughout his career. Mr. Scheel currently works as the Assistant Director of Course Development at Sam Houston State University ("SHSU"), a position he has held for six months, where he leads a team of designers in the creation and technological management of online courses. Before becoming the Assistant Director of Course Development, Mr. Scheel was the Team Lead of Instructional Designers at SHSU for five years, assisting online course instructors with technical aspects of course management.

Prior to joining SHSU in April of 2011, Mr. Scheel spent fifteen years as a system support and evaluation specialist, database applications programmer, and database administrator for the Windham School District, a non-geographical school district that provides educational services to Texas Correctional facilities. He worked extensively with filePro in that position, as a programmer, developer, and, for a period of time, as the filePro Database Administrator for the Windham School District.

From 1994 to 2012, Mr. Scheel also operated a technology consulting company, Scheel Media Solutions. As a consultant, Mr. Scheel evaluated, recommended, and integrated technological resources for his clients. He provided on-site training for various software packages, assisted in network configuration and miscellaneous troubleshooting, and provided internet site and application development services.

Mr. Scheel holds a B.S. in Computer Science from Texas A&M University.

Nancy Rue, Esq.
Patrick Murray, Esq.
Assistant U.S. Attorneys
January 16, 2017
Page 6

2) Summary of Anticipated Testimony. It is anticipated that Mr. Scheel would, if called as a witness, offer testimony regarding the general operation and programming of filePro database systems and the specific filePro database system used at Guaranteed Returns. Based on his training and experience with filePro, Mr. Scheel would testify about the way data is stored within filePro, the proper method for deleting filePro records and reclaiming space within a database, and particular problems that may arise when a filePro system contains a large amount of data. Mr. Scheel would likely also testify about the effects that certain errors may have on the functioning of a filePro database, and ways such errors may be addressed.

## William F. Shea

1) Qualifications. William Shea is a partner at Floyd Advisory, a consulting firm that provides financial and accounting expertise in business strategy, valuation, financial reporting, and transaction analysis. Mr. Shea has extensive experience providing accounting, advisory, and investigative services, including in connection with post-acquisition and earn-out disputes, forensic accounting, valuation assignments, and special investigations. Mr. Shea has worked with clients in various industries, including financial services, retail and consumer goods, pharmaceuticals, healthcare, construction, government, and not-for profits. He has testified before a FINRA Dispute Resolution Arbitration Panel and before the Connecticut Superior Court as an expert on damages.

Before becoming a partner, Mr. Shea was a Senior Manager in the Financial and Litigation Consulting practice at Floyd Advisory. Prior to joining Floyd Advisory, Mr. Shea was a Senior Consultant with FTI Consulting in their Forensic and Litigation Consulting Practice, and an Analyst in Huron Consulting Group's Accounting and Financial Consulting Practice.

Mr. Shea is a Certified Public Accountant and a Chartered Global Management Accountant. Mr. Shea holds a B.S. in Finance and Accounting from Boston College.

2) Summary of Anticipated Testimony. It is anticipated that Mr. Shea would, if called as a witness, testify regarding his analysis of certain Guaranteed Returns indate and customer records. Specifically, Mr. Shea would testify as to the correlation between (a) any indates that government customers sent to defendant Guaranteed Returns which were reprocessed to GRx stores after October 2007; and (b) government customers who,

Nancy Rue, Esq.
Patrick Murray, Esq.
Assistant U.S. Attorneys
January 16, 2017
Page 7

pursuant to the terms of Contract Number SPM200-07-D-5201, elected to switch from
Guaranteed Returns to another reverse distributor.

Very truly yours,

Robert M. Radick

cc:     Douglas E. Grover, Esq.
        Thomas Kissane, Esq.
        Robert J. Cleary, Esq.
        William C. Komaroff, Esq.
                (by email)

United States v. Devos Ltd. d/b/a Guaranteed Returns et al.
14-cr-574 (PBT) (E.D. Pa.)
Defendants' Exhibit List as of January 16, 2017

| BEGINNING BATES NUMBER | ENDING BATES NUMBER |
|---|---|
| CHASE002907 | CHASE002994 |
| CHASE002999 | CHASE003360 |
| CITIBANK006108 | CITIBANK006160 |
| CITIBANK007740 | CITIBANK007881 |
| D0000001 | D0000002 |
| D0000003 | D0000025 |
| D0000026 | D0000026 |
| D0000027 | D0000027 |
| D0000028 | D0000028 |
| D0000029 | D0000029 |
| D0000030 | D0000030 |
| D0000031 | D0000063 |
| D0000064 | D0000068 |
| D0000069 | D0000069 |
| D0000070 | D0000072 |
| D0000073 | D0000075 |
| D0000076 | D0000076 |
| D0000077 | D0000077 |
| D0000078 | D0000078 |
| D0000079 | D0000079 |
| D0000080 | D0000080 |
| D0000081 | D0000081 |
| D0000082 | D0000082 |
| DCIS-000048 | DCIS-000083 |
| DCIS-000097 | DCIS-000102 |
| DCIS-000183 | DCIS-000187 |
| DCIS-000656 | DCIS-000672 |
| DCIS-000673 | DCIS-000673 |
| DCIS-000674 | DCIS-000681 |
| DCIS-000682 | DCIS-000682 |
| DCIS-000685 | DCIS-000686 |
| DCIS-000688 | DCIS-000689 |
| DCIS-000690 | DCIS-000690 |
| DCIS-000691 | DCIS-000692 |
| DCIS-000693 | DCIS-000693 |
| DCIS-003588 | DCIS-003680 |
| DCIS-004415 | DCIS-004437 |
| DCIS-004877 | DCIS-004882 |
| DCIS-006612 | DCIS-006671 |
| DCIS-007008 | DCIS-007141 |
| MCOV00166 | MCOV00171 |
| MERRILL-012750 | MERRILL-012884 |

\* Note: The defendants reserve the right to supplement this exhibit list and to make further disclosures pursuant to Rule 16(b)(1)(A) at any time before or during trial.

United States v. Devos Ltd. d/b/a Guaranteed Returns et al.
14-cr-574 (PBT) (E.D. Pa.)
Defendants' Exhibit List as of January 16, 2017

| BEGINNING BATES NUMBER | ENDING BATES NUMBER |
|---|---|
| MERRILL-012895 | MERRILL-012965 |
| MERRILL-012969 | MERRILL-013029 |
| MERRILL-013043 | MERRILL-013152 |
| MERRILL-013171 | MERRILL-013366 |
| MERRILL-013379 | MERRILL-013416 |
| MERRILL-013427 | MERRILL-013436 |
| MERRILL-013447 | MERRILL-013454 |
| MERRILL-013465 | MERRILL-013472 |
| MERRILL-013483 | MERRILL-013488 |
| MERRILL-013491 | MERRILL-013494 |
| MERRILL-013507 | MERRILL-013510 |
| MERRILL-017406 | MERRILL-017499 |
| MERRILL-026494 | MERRILL-026494 |
| MERRILL-027416 | MERRILL-027463 |
| MERRILL-031867 | MERRILL-032376 |
| QPH06-1077207-0055129 | QPH06-1077207-0055132 |

* Note: The defendants reserve the right to supplement this exhibit list and to make further disclosures pursuant to Rule 16(b)(1)(A) at any time before or during trial.

# Exhibit M

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| | : | |
| v. | : | CRIMINAL ACTION |
| | : | |
| DEVOS LTD. d/b/a Guaranteed | : | NO. 14-574 (PBT) |
| Returns, et al. | : | |
| | : | |

**DEFENDANTS' OPPOSITION TO THE GOVERNMENT'S MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY**

## <u>TABLE OF CONTENTS</u>

I.   **THE DEFENDANTS' EXPERT DISCLOSURES FULLY SATISFY THE
     REQUIREMENTS OF RULE 16 OF THE FEDERAL RULES OF CRIMINAL
     PROCEDURE** ............................................................................................. 2

II.  **THE ANTICIPATED TESTIMONY OF EACH OF THE DEFENDANTS' EXPERT
     WITNESSES WILL BE FULLY CONSISTENT WITH THE REQUIREMENTS OF
     RULES 702 AND 704 OF THE FEDERAL RULES OF EVIDENCE, AND THE
     GOVERNMENT'S PREMATURE MOTION MUST THEREFORE BE DENIED** ..... 5

     A.   **Brian Berntson's Anticipated Testimony Will Be Relevant and Helpful to the
          Jury, and In Fact, Federal Prosecutors Have Previously Elicited His Money
          Laundering Expert Testimony in This and Other Circuits** ...................................... 7

     B.   **Mr. Harris Devor's Testimony Will Help the Jury Evaluate Whether the
          Transactions Underlying the Government's Money Laundering Charge Are
          Open and Transparent, and Whether Those Transactions Have Irregular or
          Unusual Features that Suggest an Intent to Conceal** ............................................... 9

     C.   **Professor Claire Finkelstein's Testimony Will Help the Jury Evaluate the
          Complex Morass of Contractual Documents, Forms, Marketing Materials, and
          Other Statements in this Case; Is Admissible to Show That Guaranteed Returns's
          Customers Were on Notice Regarding the Handling of Their Indates; and Will
          Help the Jury Assess the Presence or Absence of Criminal Intent** ....................... 11

     D.   **Dr. Sophia Pasedis Will Help the Jury Understand How the Reverse
          Pharmaceutical Industry Developed, Which is Crucial Background Information
          for the Defense Case** .............................................................................................. 15

     E.   **Mr. Raymond Scheel's Testimony Will Help the Jury Understand the Legitimate
          Technical Reasons That Can Necessitate the Deletion of FilePro Data, and Will
          Also Assist the Jury's Evaluation of Whether FilePro Data Was Deleted with
          Criminal Intent** ....................................................................................................... 19

     F.   **The Testimony of Mr. William Shea Will Summarize Voluminous Records, and
          Will Enable the Jury to Assess the Defense Assertion that, After October 2007,
          Guaranteed Returns Returned Government Indates for Its Own Account Only
          When Government Customers Had Switched to Another Reverse Distributor and
          Abandoned Their Indates** ....................................................................................... 22

**CONCLUSION** ....................................................................................................... 24

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Neuharth v. NACCO Materials Handling Grp., Inc.*, 2002 WL 34700601 (D.S.D. Dec. 17, 2002)

...................................................................................................................... 18

*First Nat. State Bank of New Jersey v. Reliance Elec. Co.*, 668 F.2d 725 (3d Cir. 1981)............ 13

*S.E.C. v. Johnson*, 525 F. Supp. 2d 70 (D.D.C. 2007).................................................. 10

*Sprint Nextel Corp. v. Simple Cell, Inc.*, 2016 WL 524279 (D. Md. Feb. 10, 2016) .................. 17

*Teen-Ed, Inc. v. Kimball Intern., Inc.*, 620 F.2d 399 (3d Cir. 1980) ............................ 21

*United States v. Barber*, 80 F.3d 964 (4th Cir. 1996)..................................................... 8

*United States v. Bates*, 2012 WL 1579590 (D. Idaho May 4, 2012) ............................ 7

*United States v. Caputo*, 382 F. Supp. 2d 1045 (N.D. Ill. 2005) ............................... 15

*United States v. Cardenas*, 2002 WL 34355104 (S.D. Fla. Jan. 4, 2002) .................... 7

*United States v. Cavin*, 39 F.3d 1299 (5th Cir. 1994) ............................................ 13-14

*United States v. Downing*, 753 F.2d 1224 (3d Cir. 1985)........................................ 6

*United States v. Georgiou*, 777 F.3d 125 (3d Cir. 2015) ......................................... 23

*United States v. Hoffecker*, 530 F.3d 137 (3d Cir. 2008)........................................ 3-4

*United States v. Jackson*, 51 F.3d 646 (7th Cir. 1995) ......................................... 2

*United States v. Jasin*, 215 F.Supp.2d 552 (E.D. Pa. 2002) ................................. 13

*United States v. Lipscomb*, 539 F.3d 32 (1st Cir. 2008) ...................................... 2

*United States v. Mehta*, 236 F.Supp.2d 150 (D. Mass 2002)................................. 2

*United States v. Nacchio*, 519 F.3d 1140 (10th Cir. 2008)................................... 4-5

*United States v. Richardson*, 658 F.3d 333 (3d Cir. 2011) ................................. 8-9

*United States v. R.J. Reynolds Tobacco Co.*, 416 F.Supp. 313 (D.N.J. 1976)............... 6

*United States v. Schiff*, 538 F. Supp. 2d 818 (D.N.J. 2008) .......................................................... 17

*United States v. Universal Rehabilitation Services, Inc.*, 1996 WL 297575 (E.D. Pa. May 31, 1996) .................................................................................................................................... 13

*Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867 (5th Cir. 2013) .............................................. 21

## STATUTES AND RULES

Federal Rule of Criminal Procedure 16 .............................................................................. 2, 4, 5

Federal Rule of Evidence 702 ........................................................................................... *passim*

Federal Rule of Evidence 704 ................................................................................. 5, 6, 10, 13

## OTHER AUTHORITIES

Federal Rule of Criminal Procedure 16, 1993 Advisory Committee Notes ........................ 2, 3, 18

Federal Rule of Evidence 702, 1972 Advisory Committee Notes .............................................. 18

Defendants Devos Ltd. d/b/a Guaranteed Returns ("Guaranteed Returns" or the "Company"), Dean Volkes, and Donna Fallon (collectively, "the defendants") respectfully submit this memorandum of law in opposition to the government's motion *in limine* to exclude expert testimony.

## PRELIMINARY STATEMENT

On January 16, 2017, pursuant to the Court's pretrial scheduling order of January 5, 2017, counsel for the defendants provided the government with notice of the six expert witnesses whom the defense currently plans to call at trial.  These expert notices, which were contained in a seven-page letter, identified each expert by name, described the credentials of the expert, and provided the government with a precise and detailed description of the matters that each expert is expected to address.

Two days after receiving the defendants' expert notices, the government moved *in limine* to preclude the testimony of *each and every one of the defendants' experts*.  Indeed, rather than inquire of defense counsel, or seek greater detail regarding the anticipated testimony of each potential expert, the government took the immediate and extreme step of seeking to exclude every such witness, which would cripple the defense case and deprive the jury not only of helpful testimony, but of any semblance of an ability to decide this case through a meaningful adversarial process.  Yet despite the government's host of complaints, its premature arguments, and its attack on each of the defense's witnesses, the government's motion is unavailing.  Each and every one of the anticipated defense experts will offer testimony that is entirely proper and appropriate, and the government's motion must therefore be denied.

## ARGUMENT

**I.     The Defendants' Expert Disclosures Fully Satisfy the Requirements of Rule 16 of the Federal Rules of Criminal Procedure**

Contrary to the conclusory arguments advanced in the government's brief, the defendants' expert disclosures fully satisfy the notice requirements set forth in Rule 16(b)(1)(C) of the Federal Rules of Criminal Procedure.[1]  Unlike the detailed expert disclosures required in civil matters, Rule 16 permits disclosures that are "by no means detailed," *United States v. Lipscomb*, 539 F.3d 32, 38 (1st Cir. 2008), and in fact, "[i]n some instances, a generic description of the likely witness and that witness's qualifications may be sufficient," Fed. R. Crim. P. 16, 1993 Advisory Committee Notes.  *See also United States v. Mehta*, 236 F. Supp. 2d 150, 155 (D. Mass 2002) (criminal discovery rules are narrower than civil rules due to "the special constitutional constraints of criminal proceedings").

Thus, in contrast to the "complete statement" of an expert's opinion required in civil discovery, courts have held that Rule 16 can be satisfied by short and general summaries of the matters about which an expert will testify.  *See, e.g., United States v. Jackson*, 51 F.3d 646, 651 (7th Cir. 1995) (Rule 16 disclosure of witness's opinion satisfied by statement that "the witnesses 'may testify at trial concerning the use of beepers, firearms, walkie-talkies, and Western Union wire transfers in connection with the sale of narcotics.'").

The defendants' January 16, 2017 expert disclosures fully comply with the foregoing standards.  Indeed, for each and every one of the six anticipated witnesses as to whom the defendants have provided expert notice under Rule 16(b)(1)(C), the defendants have identified

---

[1] The defendants' expert disclosures, which are set forth in a seven-page letter that defense counsel sent to Assistant U.S. Attorneys Nancy Rue and Patrick Murray on January 16, 2017, are attached as Exhibit One to the government's motion *in limine*, and are referred to herein as "Defense Expert Disclosures."

the witnesses' relevant experience and described with specificity the matters about which the witness is expected to testify.  *See, e.g.,* Defense Expert Disclosures at 3 (explaining that Mr. Harris Devor has nearly forty years of experience as a forensic accountant, will testify as to his review of "the financial transactions by which funds were deposited into and transferred out of Guaranteed Returns' bank accounts," and that his testimony will be based upon "his analysis of Guaranteed Returns' banking relationships and financial records."); *id.* at 6 (explaining that Mr. Raymond Scheel has over twenty years of experience in software development and computer programming, and is expected to testify regarding "the proper method for deleting filePro records and reclaiming space within a database," as well as "particular problems that may arise when a filePro system contains a large amount of data.").

Although the government contends that these detailed disclosures are insufficient and require the exclusion of every single one of the experts that the defendants intend to call, the summaries in the Expert Disclosure Letter are more than adequate to comply with the Federal Rules.  They will "permit more complete pretrial preparation" by the government, and will allow the government to prepare a "focused cross-examination" concerning the matters described in the defendants' notice.  Fed. R. Crim. P. 16, 1993 Advisory Committee Notes (explaining the purpose of the expert notification rules).[2]

The arguments to the contrary that the government advances in its brief either misconstrue the law or are premised on issues not present in this case.  First and foremost, *United States v. Hoffecker*, 530 F.3d 137, 185 (3d Cir. 2008), on which the government relies to support its request for the exclusion of the defense experts, is wholly inapplicable.  In *Hoffecker*,

---

[2] Further, to the extent there is any doubt regarding the sufficiency of the disclosures set forth in the letter that was provided to the government on January 16, 2017, the detailed descriptions of the experts' anticipated testimony in Section II below is more than amply sufficient to satisfy Rule 16's requirements.

3

the court upheld the exclusion of expert testimony because the defendant, despite asking for multiple continuances, did not provide notice of his intent to call expert witnesses until three days before trial, and then provided no justification for the delay.  In reaching its holding, the *Hoffecker* court made clear that it was relying on the defendant's unjustified late disclosure to exclude the testimony, and not merely on the purported defects in that disclosure.  *Id.* at 187.  Here, the government cannot dispute that the defendants gave timely notice of their intent to call expert witnesses, and that alone renders *Hoffecker* inapplicable.  Nor does the government provide any explanation as to why the expert disclosures in this case are at all comparable to those present in *Hoffecker*, and therefore, the government has offered the Court no basis for relying upon *Hoffecker* to preclude the defendants' expert testimony.

The government also complains that the defendants' expert disclosures did not include a report written by each of the defense's anticipated experts.  This argument is baseless.  Rule 16 requires a summary of expert testimony, not a report prepared by the expert.  Fed. R. Crim. Proc. 16(b)(1)(C); *see also United States v. Nacchio*, 519 F.3d 1140, 1152 (10th Cir. 2008) ("[A]n expert in a criminal case is not required to present and disclose an expert report in advance of testimony."), *rev'd on other grounds in United States v. Nacchio*, 555 F.3d 1234 (10th Cir. 2009) (en banc).

Similarly baseless is the government's complaint that the defendants' disclosure purportedly does not provide enough information to evaluate whether the defense's proposed expert testimony satisfies Federal Rule of Evidence 702.  The purpose of Rule 16 disclosure is not to allow a pretrial determination about the admissibility of expert testimony.  Indeed, rather than being required in every case, as one would expect for a notice that is intended to allow the Court to make pretrial admissibility determinations, Rule 16 disclosures are required only when

requested by the defendant.  Further, "a Rule 16 disclosure need not be filed with the court, but only with opposing counsel, which makes clear that it is not intended to serve as the basis for a judicial determination regarding admissibility."  *See Nacchio*, 519 F.3d at 1151.[3]

For the foregoing reasons, the government's claim as to the supposed inadequacy of the defendants' expert disclosures in devoid of merit, and fails to justify the government's efforts to exclude the essential testimony of the defense experts in this case.

## II.     The Anticipated Testimony of Each of the Defendants' Expert Witnesses Will Be Fully Consistent With the Requirements of Rules 702 and 704 of the Federal Rules of Evidence, and the Government's Premature Motion Must Therefore Be Denied

The government also challenges the admissibility of the anticipated testimony of the defense's experts under Federal Rules of Evidence 702 and 704.  As discussed above, any such challenge is premature, as the purpose of pretrial Rule 16 disclosures regarding expert testimony is not to provide the basis for evaluating the admissibility of a party's experts.  Indeed, a final ruling on the admissibility of any expert testimony at this stage would be improper, because the defendants do not need to make a decision regarding what witnesses will testify and what precise testimony to elicit from them until the close of the government's case.  The government's motion should therefore be denied as premature.

Putting aside the premature nature of the government's motion, it fails on the merits as well.  Rule 702 recognizes that expert testimony is appropriate and admissible when it "will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702;

---

[3] The government also complains that the defense did not provide the government with *curriculum vitae* ("CV") for its witnesses.  This, too, is a meritless position, as the defendants' expert notice gave fulsome descriptions of each witness's extensive experience and qualifications, and fully satisfied the defendants' obligations under Rule 16. Further, while there is no requirement that defense counsel provide the government with a description of expert qualifications in the form of a CV, the defendants have since provided the government with CVs for all six of the experts that the defense may call at trial.

*United States v. R.J. Reynolds Tobacco Co.*, 416 F.Supp. 313, 315 (D.N.J. 1976) ("[I]t is the very purpose of expert testimony to assist the trier of facts . . . to understand, evaluate and decide the complex evidential materials in a case."); *United States v. Downing*, 753 F.2d 1224, 1226, 1229 (3d Cir. 1985) (Rule 702 "contemplates a liberal view toward the admissibility of expert testimony generally" and "usually favors admissibility").  Rule 704 then somewhat narrows the scope of Rule 702 by providing that, "in a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charges or a defense."

As explained in detail below, none of the defendants' experts will offer an opinion as to whether Dean Volkes, Donna Fallon, or the company did or did not have the mental state necessary to be convicted of the offenses charged in the indictment.  Defense counsel are well aware that such direct testimony regarding the existence of a requisite mental state or condition is impermissible, and defense counsel and their experts will fully comply with the Rule.  The experts will, however, offer testimony on complex subjects that are directly relevant to the facts in issue (including facts that have bearing on the critical issues of intent), and will thereby help the jury evaluate and understand the evidence that will be presented in the case.  The following description of each expert's anticipated testimony, which supplements the disclosures contained in the defendant's expert notice, fully confirm not only the appropriateness of the anticipated testimony of the defendants' experts in this case, but also demonstrate the full extent to which such testimony is necessary to the defendants' ability to protect their rights and adequately defend themselves from the charges the government has alleged.[4]

---

[4] The defendants' reserve the right to modify, withdraw, or expand the scope of any of the testimony described below based on the evidence presented and theories pursued at trial.

**A. Brian Berntson's Anticipated Testimony Will Be Relevant and Helpful to the Jury, and In Fact, Federal Prosecutors Have Previously Elicited His Money Laundering Expert Testimony in This and Other Circuits**

Brian Berntson's testimony will provide background information about the criminal practices typical of money launderers.  Based upon his first-hand experience as a former federal agent who not only investigated cases but also trained other agents to testify as money laundering experts, Mr. Berntson will explain the types of complex conduct that money launderers use to conceal or disguise the nature, location, source, ownership and control of illegal proceeds.  This testimony will assist the jury in evaluating and understanding the evidence relevant to Count 54 of the Superseding Indictment, which charges the defendants with conspiracy to commit money laundering.  *See, e.g., United States v. Bates*, 2012 WL 1579590, at *1 (D. Idaho May 4, 2012) (finding that "[m]ethods of money laundering and structuring are not self-evident to a layperson," and therefore that "expert testimony on these topics [would] assist the jurors in understanding the evidence"); *United States v. Cardenas*, 2002 WL 34355104, at *2 (S.D. Fla. Jan. 4, 2002) (allowing expert testimony regarding "the common practices of money launderers," because "expert testimony regarding money laundering techniques . . . [would] 'assist the trier of fact to understand the evidence or to determine a fact in issue'") (citing Fed. R. Evid. 702).  It will assist the jury in identifying relevant factors to consider when assessing whether the financial transactions on which the money laundering count hinges – namely, transactions that were made only *after* Guaranteed Returns received refunds from pharmaceutical manufacturers – reflect an intent to conceal.  And, it will decidedly *not* include any opinion as to whether the defendants in this case actually had the mental state necessary to be guilty of a money laundering conspiracy.

The propriety of Mr. Berntson's anticipated testimony is further underscored by specific language in the opinion by which this Court ruled upon the defendant's motion to dismiss the

money laundering charge in this case.  In particular, in its January 10, 2017 decision, the Court

explained that, when making a determination as to whether there is intent to commit money

laundering, the jury "may weigh various forms of evidence, including "*expert testimony on the*

*practices of criminals.*"  Opinion of Jan. 20, 2017, at 29 (quoting *United States v. Richardson*,

658 F.3d 333, 340 (3d Cir. 2011) (emphasis added); *see also United States v. Barber*, 80 F.3d

964, 970 (4th Cir. 1996) (admitting expert testimony on practices of money launderers).  This is

precisely the form of testimony that former Special Agent Brian Berntson is expected to offer at

trial.  As a former Special Agent who was with the Internal Revenue Service's Criminal

Investigation Division for twenty-two years, Mr. Berntson has extensive experience with the

ways in which individuals launder the proceeds of a range of specific unlawful activities,

including mail fraud, wire fraud, and the theft of government property.  If called to testify, Mr.

Berntson will explain to the jury the practices commonly used by money launderers, such as the

diversion of funds through shell corporations held in third-party names, and the repatriation of

funds through loans from those corporations.  He will also explain to the jury the money

laundering concepts of placement, layering, and integration.  Mr. Berntson has offered this type

of expert testimony on behalf of the government in seven prior cases, including a criminal matter

in the Middle District of Pennsylvania.  *See United States v. Ciavarella*, Case No. 09-272 (M.D.

Pa. Feb. 14, 2011), Trial Transcript of Feb. 14, 2011, at 36 (Docket Entry 234).

      The government's efforts to exclude Mr. Berntson's testimony are thus baseless and

contrary to this Court's January 10, 2017 decision.  Indeed, because Mr. Berntson has been

allowed to offer expert testimony *for the government* on the practices of money launderers, the

government's attempts to exclude Mr. Berntson when he is offered as an expert for the *defense*

reflects their inconsistent, overly broad, and unfair approach towards the expert testimony in this case.

> **B.   Mr. Harris Devor's Testimony Will Help The Jury Evaluate Whether the Transactions Underlying the Government's Money Laundering Charge Are Open and Transparent, and Whether Those Transactions Have Irregular or Unusual Features that Suggest an Intent to Conceal**

Also relevant to the money laundering conspiracy charge in Count 54 is Mr. Harris Devor's anticipated testimony, which will relate to the conduct that is at the core of this charge – namely, the transactions that took place after Guaranteed Returns received refund money from drug manufacturers.  Mr. Devor's testimony will help the jury assess whether these financial transactions accomplished legitimate business objectives and are typical of closely held corporations like Guaranteed Returns, or, conversely, whether the transactions had irregular features or no legitimate purpose and thus are suggestive of an intent to conceal.

Again, the Court's decision of January 10, 2017 underscores the relevance and admissibility of this type of testimony.  In its decision, the Court explained that as a general matter, a trier of fact may infer that a transaction involving the alleged proceeds of a specified unlawful activity can evince the requisite intent to conceal based on "irregular features of the transaction" or a purported "series of unusual financial moves cumulating in the transaction." *Id.* at 29 (quoting *Richardson*, 658 F.3d at 340).  Applying that principle to the allegations in the Superseding Indictment, the Court found that the government had alleged that the bank transfers underlying the money laundering charge were "unusual financial moves" with "irregular features," and that these allegations, if true, supported an inference that the defendants acted with intent to conceal. *Id.* at 31-32.

Mr. Devor's testimony, if offered at trial, will enable the jury to assess these complex issues that lie at the heart of the money laundering charge.  Specifically, Mr. Devor is expected

9

to testify that there was nothing "irregular" or "unusual" about the bank transfers that occurred after Guaranteed Returns received refund moneys from drug manufacturers, and that those transfers are typical for closely held corporations.  Such testimony is wholly permissible under Rule 702, because it will help the jury understand the evidence concerning Guaranteed Returns's banking transfers and will aid the jury in determining a fact in issue, specifically, whether Guaranteed Returns's banking transfers were irregular or unusual.  And Mr. Devor is fully qualified to offer such an opinion – he is a Certified Public Accountant with over forty-two years of experience auditing closely held businesses and providing other forensic services across a wide range of industries and companies, and he has analyzed Guaranteed Returns's banking relationships, financial records, and the post-refund transactions that form the basis of the money laundering charge in this case.  Mr. Devor's testimony should therefore be permitted.  *S.E.C. v. Johnson*, 525 F. Supp. 2d 70, 77-78 (D.D.C. 2007) (permitting expert testimony on accounting principles and financial concepts because this testimony is helpful to the jury).

In seeking to exclude Mr. Devor's testimony, the government speculates that Mr. Devor's testimony will violate Rule 704(b), which provides that "an expert must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged."  Fed. R. Evid. 704(b).  Yet Mr. Devor will do no such thing.  Mr. Devor's opinion concerns the regularity of the type of transactions underlying the government's money laundering charge, and relates to whether there are legitimate business reasons for the financial transactions that the government has attempted to criminalize.  He is an accountant, not a psychologist or clairvoyant, and he will not offer an opinion about the defendants' state of mind.  His testimony will be entirely proper, is consistent with the rules, and must therefore be allowed.

**C. Professor Claire Finkelstein's Testimony Will Help the Jury Evaluate the Complex Morass of Contractual Documents, Forms, Marketing Materials, and Other Statements in this Case; Is Admissible to Show That Guaranteed Returns's Customers Were on Notice Regarding the Handling of Their Indates; and Will Help the Jury Assess the Presence or Absence of Criminal Intent**

Professor Claire Finkelstein is an esteemed Professor of Law at the University of Pennsylvania Law School, and she is expected to testify as to the interplay between the contracts that Guaranteed Returns entered into with its customers, the Return Authorization Forms that plainly disavowed any obligation to provide credit for drugs that were not yet returnable, the marketing materials that sales representatives used and the statements they made when trying to increase their commissions, and other topics that are directly relevant to the charges involving indates and alleged hidden fees. This anticipated testimony will help the jury assess whether the language in various written contracts, forms, and other documents is inconsistent with the government's claim that Guaranteed Returns defrauded its customers of their indates, and will also enable the jury to assess whether complex contract language and other provisions that were included in the contract documents provided notice to customers that they would not receive credit for their indates.

More specifically, Professor Finkelstein is expected to testify on the following subjects, offer the following opinions, and provide the following background information:

- Professor Finkelstein is expected testify to the jury about principles of contract interpretation – such as offer and acceptance, the impact of integration clauses in a contract, and the significance of incorporation by reference. All of these principles determined the content and scope of Guaranteed Returns' contractual obligations to its customers, and are beyond the knowledge or understanding of an average lay juror.

- Professor Finkelstein is expected to discuss the degree of disclosures that are required for sophisticated commercial actors, and those that are expected for average consumers. In particular, she will discuss the general legal principle that corporations, unlike individual consumers, are expected to read and understand the provisions of contracts they enter into and documents they accept and use.

11

- Professor Finkelstein is expected to discuss those provisions of the contracts between Guaranteed Returns and its customers which specifically and clearly provided that marketing materials, and other statements that a sales representative may have made to a customer, are not part of the governing contract between Guaranteed Returns and the customer.  Professor Finkelstein will further explain how integration clauses, such as those found in many Guaranteed Returns contracts, provided customers with notice that any promises made in oral statements or marketing materials were not binding on Guaranteed Returns or part of its contractual obligations.

- Professor Finkelstein is expected to explain that certain documents and forms (including the Return Authorization forms) supplement the governing contract between Guaranteed Returns and a customer, even though those documents are physically distinct from the original contractual agreement between the parties. Professor Finkelstein will offer her opinion as to the notice that such documents gave customers regarding the handling of their indates.

- Professor Finkelstein is expected to testify about the terms of the contracts between the Defense Supply Center Philadelphia (the "DSCP") and Guaranteed Returns, and to opine on whether and when those contracts provided for indate management services, and whether and when they did not.  Professor Finkelstein is also expected to testify that when entities who contracted with Guaranteed Returns pursuant to the DSCP contract switched from Guaranteed Returns to another reverse distributor and thereby left the contractual relationship with Guaranteed Returns, Guaranteed Returns was not under a contractual obligation to affirmatively return that customer's indates, and instead had a legitimate legal basis for treating the indates as abandoned, and viewing them as such.

Here, the jury will be confronted with a morass of documents and testimony setting forth various promises, representations, and oral statements about whether Guaranteed Returns would provide indate management services or credits for indated products.  Professor Finkelstein's testimony will be essential to the jury's understanding of these issues.  By explaining and applying the principles of contract interpretation, Professor Finkelstein's testimony will help the jury understand which of the various statements and representations regarding indate services were actually part of the contracts between Guaranteed Returns and its customers, and which statements promising indate management were mere offers or other representations that never became part of the governing contracts.  Indeed, through her discussion of integration clauses both generally and in the governing contracts, Professor Finkelstein will help the jury understand

that the customers of Guaranteed Returns were specifically put on notice that they should not rely upon those statements of sales representatives that were not affirmatively included in the final contracts.

Notwithstanding the government's efforts to exclude the entirety of Dr. Finkelstein's testimony, the type of testimony she is expected to offer is entirely consistent with Rules 702 and 704, and has been permitted in prior cases.  In fact, the Third Circuit has approved the admission of expert testimony about legal principles when it is offered to help the trier of fact evaluate and understand the principles and practices used to interpret legal documents.  *First Nat. State Bank of New Jersey v. Reliance Elec. Co.*, 668 F.2d 725, 731 (3d Cir. 1981) (admitting testimony from Professor Homer Kripke, "acknowledged as an outstanding scholar and a foremost expert on the Uniform Commercial Code," to testify about bank and industry practices relevant to the interpretation of legal documents); *United States v. Universal Rehabilitation Services, Inc.*, 1996 WL 297575, at *9-10 (E.D. Pa. May 31, 1996) (permitting expert testimony about Medicare reimbursement over objection that it was improper legal testimony because "the testimony assisted the jury in understanding the rules and regulations under which [the defendant] submitted its claims for reimbursement" and "expert testimony is viewed as helpful in cases, like this one, involving complex statutes or issues outside the general knowledge of the jury").

Additionally, when expert testimony tends to demonstrate that a defendant's subjective beliefs actually accorded with the applicable law, the testimony is admissible to prove that the defendant did not act with fraudulent intent, and it may well be reversible error to exclude it. *United States v. Cavin*, 39 F.3d 1299 (5th Cir. 1994); *see also United States v. Jasin*, 215 F.Supp.2d 552, 570 (E.D. Pa. 2002) ("[A]n expert's testimony concerning the state of the law . . . is admissible as it relates to the defendants' 'understanding and resulting state of mind.'")

(quoting *Cavin*).  Here, where the government must prove that the defendants intended to defraud their customers, and where the defense will assert that the contractual provisions are inconsistent with such an intent, expert discussion of the contracts and other legal documents relevant to the case will be essential to the jury's ability to properly assess the evidence and arrive at an appropriate verdict.

The Fifth Circuit's decision in *United States v. Cavin*, which was cited above and has been followed in the Eastern District of Pennsylvania, is particularly relevant.  There, the defendant was charged with assisting allegedly fraudulent "rental asset transactions," and to rebut the charge, he offered expert legal testimony from "a veteran commercial lawyer" to prove that the rental asset transactions had the actual legal effect of producing non-fraudulent assets.  *Cavin*, 39 F.3d at 1303, 1309.  As the court explained, this legal testimony would have "supported [the defendant's] interpretation of the [rental asset] transactions," and would therefore undermine the government's claim that he acted with fraudulent intent by "bolstering [the defendant's] contention that he believed the assets to be acceptable."  *Id.* at 1309.  Just as the defendant in *Cavin* was entitled to introduce expert legal testimony to support his interpretation of the rental asset transactions, the defendants in this case are entitled to present Professor Finkelstein's testimony to show that the contracts that existed between Guaranteed Returns and its customers undermine the argument that the defendants intended to engage in deceit or fraud. *Id.*

Finally, in seeking to preclude the testimony of Dr. Finkelstein, the government relies upon the often-stated but vastly oversimplified argument that *any and all* testimony as to legal issues would improperly invade "the province of the Court."  As *Cavin* recognizes, and the defendants concede, "the declaration of controlling law must come from the Court."  *Id.* at 1309.

14

However, the defendants' offer of Professor Finkelstein's testimony would in no way contradict this proposition, because Professor Finkelstein will not state an opinion about what constitutes mail fraud, wire fraud, money laundering, or a violation of the other criminal statutes charged in the indictment.  In other words, she will in no way supplant the role of the Court with respect to the "controlling law" as to which this Court alone may properly instruct the jurors.  Instead, Dr. Finkelstein will only offer opinions about the non-controlling civil principles relevant to the agreements in this case.  For this reason, the government's reliance upon *United States v. Caputo*, 382 F. Supp. 2d 1045 (N.D. Ill. 2005), is misplaced.  *Caputo* holds that expert legal testimony is excludable where it "does little more than tell the jury what result to reach."  *Id.* at 1049.

Here, because this is not an action for breach of contract, the jury will not reach a verdict about the construction of the contracts at issue.  Professor Finkelstein's testimony is thus not about controlling law, will not tell the jury what result to reach, and will not in any way usurp the role of this Court.  Instead, it will serve to assist the jury in assessing complex facts and evidence, and will better position the jury to understand and assess whether the contractual provisions in this case undermine the argument that the defendants intended to engage in deceit or fraud.  For these reasons, Professor Finkelstein's testimony is entirely proper and the government's efforts to exclude it should be denied.

### D. Dr. Sophia Pasedis Will Help the Jury Understand How the Reverse Pharmaceutical Industry Developed, Which is Crucial Background Information for the Defense Case

In seeking to preclude the testimony of Dr. Sophia Pasedis, the government states as follows:

> the defendants assert that Dr. Pasedis will testify about the evolution of the returns industry, including the evolution in treatment of indated products by reverse distribution companies and their customers. That is not an issue in this case.  The

> issue is whether the defendants told their customers that they would hold on to
> indated products and return them on the customers' behalf, but instead returned
> them and kept the money.

Gov't Br. at 6-7.  The government's argument that Dr. Pasedis's testimony should be excluded as

irrelevant assesses relevance based solely on the government's own view of the case, rather than

on anything that remotely resembles a balanced view of the case as a whole.  Indeed, if it were

granted, the government's motion would cast aside the defendants' right to present expert

testimony that will not only help develop the defense case, but will also ensure that the jury fully

understands it.

The evidence at trial will show that some of Guaranteed Returns' customers were paid for

indates and others were not.  The government asserts that this was because the company was

stealing indates from those customers that were not paying attention.  Defendants have a

different explanation, however, and Dr. Pasedis' testimony is critical to understanding it.

Indated drugs, even today, represent only a small percentage of the total volume of

returned drugs.  A major argument of the defense will be that: (1) in the early days of the reverse

distribution industry, customers expected payment only for expired, not indated drugs and, if

customers retuned indates at all, it was only to clear them from their shelves without any

expectation of payment; (2) as their storage and computer tracking capacities grew, it became

feasible for returns companies to hold and age indates for customers; (3) as the industry matured,

competitors began to offer indate aging, and customers began to demand it; (4) these

developments and the resulting customer demands developed over a period of years; and

(5) although its disclosures made plain that Guaranteed Returns was not obligated to pay

customers for indates, it would often do so in response to a customer demand, in order to keep

that customer from defecting to a competitor.

Dr. Pasedis's anticipated testimony concerning how the reverse pharmaceutical industry developed, and how indate management developed within the industry, provides essential context that will help the jury understand this explanation as to why some of Guaranteed Returns' customers were paid for indates and others were not.  Explaining the evolution or operational details of a complex industry relevant to a claim or defense is a proper and common function for expert witnesses.  For example, in *United States v. Schiff*, 538 F. Supp. 2d 818 (D.N.J. 2008), *aff'd,* 602 F.3d 152 (3d Cir. 2010), the defendant was indicted for securities fraud based on alleged failures of disclosure regarding "sales acceleration leading to excess inventory build-up" at a pharmaceutical company.  538 F. Supp. 2d at 826-27.  The court rejected the government's effort to exclude the defendant's proffered expert on relevance grounds, concluding:

> Dr. Fein is offered to provide the jury with information related to the complex distribution system employed by manufacturers, wholesalers, and retail sellers to provide pharmaceutical products to customers. . . .[¶] [C]ourts routinely admit testimony from industry experts related to the business practices in those industries.[5]  *See, e.g., United States v. Leo,* 941 F.2d 181 (3d Cir.1991) (affirming the admission of a Governmental contracting expert's testimony regarding industry customs and practices in the field of defense contracting).

*Id.* at 846; *see also Sprint Nextel Corp. v. Simple Cell, Inc.*, 2016 WL 524279, at *4 (D. Md. Feb. 10, 2016) (holding that, in case alleging unauthorized resale of Sprint cellular phones, it is proper to admit expert guidance regarding "when and why a customer would sell her phone in the secondary handset market; that the secondary market largely services insurance replacement

---

[5]  The reference to "those industries" appears to relate to the industries of the experts' specialization, rather than to the any particular industry.  But plainly, the facts of the case confirm that aspects of the pharmaceutical industry, including its "complex distribution system," may be appropriate for expert testimony.

programs, BYOD programs, and Lifeline services; and that cellular service operators such as

Sprint, retailers such as Best Buy, and online sites such as Amazon all participate in the

secondary handset market."); *Neuharth v. NACCO Materials Handling Grp., Inc.*, 2002 WL

34700601, at *1 (D.S.D. Dec. 17, 2002) (in case involving negligence in design of vehicle

lacking Roll Over Protection System ("ROPS"), holding it proper to admit expert guidance

regarding "(1) whether vehicle rollover hazard was recognized prior to 1974; (2) whether it was

technologically feasible to install compactors with a ROPS by 1974; (3) whether a ROPS is

effective; and (4) whether Hyster knew of the rollover hazard and the ROPS technology.")

Finally, the government's objection that the defendants do not identify the "opinions" Dr.

Pasedis will offer misses the point.  Experts are not limited to giving opinion testimony.  *See*

Fed. R. Evid. 702, 1972 Advisory Committee Notes ("Most of the literature assumes that experts

testify only in the form of opinions. The assumption is logically unfounded. The rule accordingly

recognizes that an expert on the stand may give a dissertation or exposition of scientific or other

principles relevant to the case, leaving the trier of fact to apply them to the facts."); *see also* Fed.

R. Crim. P. 16, 1993 Advisory Committee Notes (1993) (no disclosure of an expert's opinion is

required if "the expert will be providing only background information on a particular issue").

Rather, as *United States v. Schiff* and various other cases cited above illustrate, experts may

explain background factual matter that is useful to the jury's understanding of relevant claims

and defenses.  That is precisely what the defendants propose to have Dr. Pasedis do.[6]

---

[6]  The government has not challenged Dr. Pasedis qualifications, resting its arguments with
respect to her entirely on relevance grounds.  In any event, the defendants' disclosure confirms
that Dr. Pasedis will speak to her knowledge of the reverse pharmaceutical industry based on
"over twenty-five years of experience in the field of pharmacy/health care management, during
which she has witnessed the development and evolution of the reverse distribution
pharmaceutical industry while working directly with numerous reverse distribution companies."

**E.  Mr. Raymond Scheel's Testimony Will Help the Jury Understand the Legitimate Technical Reasons That Can Necessitate the Deletion of FilePro Data, and Will Also Assist the Jury's Evaluation of Whether FilePro Data Was Deleted with Criminal Intent**

As noted above, Mr. Raymond Scheel is an expert with extensive experience in software development and computer programming.  Mr. Scheel is expected to offer testimony that will be essential to, among other things, the jury's understanding of a complex computer inventory management system known as filePro, and to the jury's proper assessment of Count 55, an obstruction of justice charge stemming from the alleged deletion of filePro data.  This testimony, like all of the testimony set forth above, is not only entirely consistent with the Federal Rules of Evidence, but also represents a critical and appropriate component to the defense of this case.

As alleged in the Superseding Indictment, Guaranteed Returns used the filePro system to track pharmaceutical products from the date drugs arrived at Guaranteed Returns until the date Guaranteed Returns returned those drugs to a manufacturer for credit.  Superseding Indictment, Counts 1-23, ¶ 25.  According to the Superseding Indictment, in March 2010, two Guaranteed Returns employees – Ronald Carlino and an individual referred to as "Person #1" – carried out a request from Mr. Volkes that they delete all data from the filePro system that was more than three years old.  *Id.*, Count 55, ¶¶ 16, 18.  The Superseding Indictment further alleges that another employee, referred to as "Person #4," used additional software known as BCWipe to remove fully filePro data that was more than three years old from Guaranteed Returns's server, also at the direction of Mr. Volkes.  *Id.*, Count 55 ¶¶ 17, 19-20.  Finally, the Superseding Indictment alleges that when filePro data was deleted from Guaranteed Returns's computers and servers, it was deleted with the criminal purpose of preventing DCIS and the grand jury from receiving and reviewing it.  *Id.* Count 55, ¶ 24.

Contrary to the allegations in the Superseding Indictment, there were perfectly legitimate reasons to delete the filePro data that had nothing to do with obstructing the grand jury's investigation or DCIS's investigation.  The defendants expect to establish at trial that, at the time of the deletion and at various times before and after, Guaranteed Returns's filePro system suffered from freezing and otherwise poor performance, and that personnel at the company believed that these performance issues were caused by the buildup of excess and fragmented data in the filePro system.  Among the technologically appropriate ways to remedy these performance problems was to delete old data, fully purge it from Guaranteed Returns's computers and servers using software akin to BCWipe, and then return a smaller amount of only the more recent data to the system.  Thus, the defendants expect to argue at trial that filePro data was not deleted for the corrupt purpose of obstructing a federal investigation; instead, the deletion was done in part to address and resolve persistent technological problems.

If called as a witness, Mr. Scheel is expected to offer expert testimony that will enable the jury to assess the legitimacy of the above-described defense.  In particular, and as his expert notice reflects, Mr. Scheel is expected to testify that the build-up of filePro data on a company's server can result in freezing and other performance issues, and that the solutions include removing the data and wiping the drive so as to remove data fragments that may interfere with the software's proper performance.  Mr. Scheel will also provide background testimony about filePro's history, development, and uses, which will give the jury a general understanding of what FilePro is, how it works, and why companies use it.

Mr. Scheel's testimony will help the jury in several entirely appropriate ways.  It will permit the jury to understand what filePro is, and how filePro works.  It will provide the jury with specialized knowledge that will assist the assessment of the government's claim that filePro

data was deleted with the purpose to obstruct.  And, Mr. Scheel will assist the jury in assessing the legitimacy of the defense argument that filePro data was deleted not for a corrupt purpose, but rather to address and correct issues that were interfering with filePro and hindering the company from processing pharmaceutical returns.  Since Mr. Scheel's testimony will help the jury understand software concepts relevant to evaluating the government's claim that the filePro data was destroyed with the intent to conceal, it is appropriate expert testimony under Rule 702. *See Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 881-82 (5th Cir. 2013) (admitting computer expert's testimony "to help the jury understand software concepts and terms" based on his "background in computer science, and knowledge about [the relevant] software").

In urging the Court to preclude Mr. Scheel from testifying, the government asserts that Mr. Scheel's testimony is improper because it somehow refers to a "hypothetical" situation.  This is simply wrong.  Mr. Scheel will be testifying about filePro, which is the *actual* software that Guaranteed Returns used.  He will testify about the legitimate reasons for deleting filePro data, and the methods for doing so, which are the core of the government's *actual* obstruction charge. Further, while the government evidently declines to credit the defense argument that the filePro data in this case was deleted for a legitimate purpose, that in no way precludes the defense from demonstrating that such a legitimate purpose in fact exists.  Indeed, the defense fully expects that the evidence at trial will show that filePro had been freezing and suffering from performance problems just prior to the deletion that the government has alleged was criminal in nature, and that the deletion was done in part to correct these problems.  Finally, even putting all of the foregoing issues aside, the government's argument is legally erroneous, because it is well settled that "a qualified expert may answer hypothetical questions."  *Teen-Ed, Inc. v. Kimball Intern.,*

21

*Inc.*, 620 F.2d 399, 404 (3d Cir. 1980).  The government's efforts to preclude Mr. Scheel's

testimony are therefore devoid of merit.

> **F.   The Testimony of Mr. William Shea Will Summarize Voluminous Records,
> and Will Enable the Jury to Assess the Defense Assertion that, After October
> 2007, Guaranteed Returns Returned Government Indates for Its Own
> Account Only When Government Customers Had Switched to Another
> Reverse Distributor and Abandoned Their Indates**

The sixth and final defense witness whom the government seeks to preclude from

testifying at trial is Mr. William Shea, a certified public accountant who has extensive experience

providing forensic accounting, advisory, and investigative services.  Mr. Shea, who is a partner

with the consulting firm Floyd Advisory, has reviewed extremely voluminous materials that

originate primarily from the FilePro database and are relevant to the government's claims that

Guaranteed Returns defrauded government customers and stole government property.  In

particular, rather than seeking to have the jury review millions of filePro records, defense

counsel have retained Mr. Shea to review those records, assess what they show about the

Company's post-2007 handling of government indates, and potentially testify at trial as to his

findings.

Mr. Shea's anticipated testimony is not only critical to the defense, but will provide the

jury with much-needed assistance in assessing whether the company defrauded the government

of credit for its indates and stole government property during the time period after 2007.  In

particular, the defendants currently intend to establish at trial that government customers who

contracted with Guaranteed Returns pursuant to the terms of DSCP contract SPM200-07-D-5201

("the DSCP 5201 Contract") generally received credit for those indates, unless such customers

abandoned their indates by switching to another reverse distributor.  Of course, one way in which

the defense could establish the treatment of government indates after 2007 would be to consume

day after day, or week after week, reviewing with the jury the filePro records of every DSCP

customer.  Alternatively, in order to streamline what will already be a lengthy trial in this matter, the defendants could seek to have an individual with extensive experience in reviewing voluminous data sets – an individual such as Mr. Shea, for example – conduct that review outside of the courtroom, and summarize his findings to the jury subject to cross-examination. Defense counsel chose the latter such approach, for reasons that should readily be apparent, but now confront the government's efforts to preclude Mr. Shea from testifying, and the government's argument that Mr. Shea's testimony is somehow "not relevant."

Contrary to the government's argument, the subject matter of Mr. Shea's testimony is clearly relevant, because it will help the jury assess the government's claim that Guaranteed Returns wrongfully stole indates that belonged to government customers.  Moreover, since Mr. Shea will provide a summary of voluminous customer records relating to the DSCP 5201 contract, his testimony is admissible under Rule 1006 of the Federal Rules of Evidence, which allows a party to "use a summary . . . to prove the content of voluminous writings [or] recordings . . . that cannot be conveniently examined in court."  Fed. R. Evid. 1006.  Additionally, because Mr. Shea's technical expertise as a forensic accountant informed his opinion and analysis, it is proper for Mr. Shea to offer his testimony as either an expert or a lay witness.  *Teen-Ed, Inc.*, 620 F.2d at 402-403 (3d Cir. 1980) (accountant's opinion testimony summarizing sales records is properly admissible as expert opinion testimony under Rule 702 or lay opinion testimony under Rule 701); *United States v. Georgiou*, 777 F.3d 125, 143-144 (3d Cir. 2015) (opinion testimony summarizing voluminous records is admissible under Rules 1006 and 701).

Here, in an abundance of caution and to ensure Mr. Shea's availability to the jury, defense counsel elected to include Mr. Shea's anticipated testimony as part of our expert disclosures.  In response, the government states that the subject matter about which Mr. Shea will

testify presents "a factual question" that requires "factual testimony." Yet the bottom line is that, as noted, Mr. Shea will use his expertise to summarize voluminous facts. Thus, semantics notwithstanding, Mr. Shea's testimony falls firmly within the scope of the Federal Rules of Evidence, is perfectly appropriate at trial, and may not properly be the subject of the government's blanket efforts at exclusion.

## CONCLUSION

For the forgoing reasons, the defendants respectfully request that the Court deny the government's motion *in limine* seeking exclusion of the defendants' experts.

Dated: New York, New York                          Respectfully Submitted,
      January 23, 2017

| | |
|---|---|
| **SCHLAM STONE & DOLAN LLP** | **LAW OFFICES OF ANN C. FLANNERY, LLC** |

**By:**  /s/ Douglas E. Grover          **By:**  /s/ Ann C. Flannery
       Douglas E. Grover                      Ann C. Flannery
       Thomas A. Kissane
       Jolène LaVigne-Albert

       26 Broadway                         1835 Market Street, Suite 2700
       New York, New York 10004          Philadelphia, Pennsylvania 19103
       Tel. 212.344.5400                   Tel. 215.636.9002
       Fax 212.344.7677                  Fax 215.636.9899
       dgrover@schlamstone.com          acf@annflannerylaw.com
       tkissane@schlamstone.com
       jlavignealbert@schlamstone.com

       *Attorneys for Defendant Devos Ltd.*
       *d/b/a Guaranteed Returns*

**MORVILLO ABRAMOWITZ
GRAND IASON & ANELLO P.C.**

**PROSKAUER ROSE LLP**

**By:**  /s/ Elkan Abramowitz
Elkan Abramowitz
Robert M. Radick
Miriam L. Glaser
Ashley C. Burns
Christopher D. Brumwell

565 Fifth Avenue
New York, New York 10017
Tel. 212.856.9600
Fax. 212.856.9494
eabramowitz@maglaw.com
rradick@maglaw.com
mglaser@maglaw.com
aburns@maglaw.com
cbrumwell@maglaw.com

*Attorneys for Defendant Dean Volkes*

**By:**  /s/ Robert J. Cleary
Robert J. Cleary
William C. Komaroff
Samantha Springer

11 Times Square
New York, New York 20036
Tel.  212.969.3000
Fax  212.969.2900
rjcleary@proskauer.com
wkomaroff@proskauer.com
sspringer@proskauer.com

*Attorneys for Defendant Donna Fallon*

25